# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

## IN ADMIRALTY

|  |  |
|---|---|
| Robert Dexter Weir<br>c/o American Civil Liberties Union,<br>125 Broad St., 18th Fl., New York, NY 10004,<br><br>Patrick Wayne Ferguson,<br>c/o American Civil Liberties Union,<br>125 Broad St., 18th Fl., New York, NY 10004,<br><br>Luther Fian Patterson<br>c/o American Civil Liberties Union,<br>125 Broad St., 18th Fl., New York, NY 10004<br><br>David Roderick Williams<br>c/o American Civil Liberties Union,<br>125 Broad St., 18th Fl., New York, NY 10004,<br><br>       Plaintiffs,<br><br>    v.<br><br>United States of America<br>950 Pennsylvania Avenue, NW<br>Washington, DC 20530,<br><br>Admiral Karl L. Schultz<br>Commandant, U.S. Coast Guard<br>2703 Martin Luther King Jr. Avenue, SE<br>Washington, DC 20020<br>in his official capacity,<br><br>       Defendants. | No. 19-cv-_____ |

## COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
## (U.S. COAST GUARD MISTREATMENT OF CIVILIAN FISHERMEN)

## INTRODUCTION

1.      This case arises out of the forced disappearance and 32 days of inhumane treatment of four Jamaican fishermen, Robert Dexter Weir, Patrick Wayne Ferguson, Luther Fian Patterson, and David Roderick Williams, at the hands of the United States Coast Guard and/or its officers ("Coast Guard"). After stopping their fishing boat in the Caribbean Sea, the Coast Guard seized the fishermen; removed them from their boat, which Coast Guard officers then destroyed; forced them to strip naked, supplying them with paper-thin coveralls; chained them to the decks of multiple Coast Guard ships, which made stops in Guantanamo Bay, the U.S. Virgin Islands, Puerto Rico, and Miami; and held them incommunicado for more than a month, all while denying them access to shelter, basic sanitation, proper food, and medical care.

2.      On September 14, 2017, the Coast Guard seized the men in international waters off the coast of Haiti. The Coast Guard destroyed their Jamaican-registered boat, the *Jossette* WH 478 (the "*Jossette*"), and detained the men, chaining them to the open decks of four Coast Guard ships for over a month in patently inhumane conditions.

3.      For all but one week of their detention, the Coast Guard kept the men outdoors on the decks of those ships and exposed to the elements at all times, even as they sailed into a hurricane. The men's skin burned and blistered in the sun. They were drenched and chilled by rain and sea water. The Coast Guard deprived the men of adequate bedding, food and water, as well as washing and sanitation facilities.

4.      Coast Guard officers also deprived the men of medical treatment for injuries they sustained onboard. They were rarely permitted to wash the salt and grime from their skin. The Coast Guard left their wounds untreated for weeks. One of the men had to have two teeth pulled due to infections. Three of them still suffer from persistent fungal infections.

5.      The Coast Guard held the men completely incommunicado, refusing their repeated and desperate pleas to contact their families in Jamaica to let them know they were alive. On each of the four ships, Coast Guard officers told the men that it was against policy to allow them to call their families. The men knew that their families would assume they had perished at sea if they did not hear from them after their disappearance during a fishing trip.

6.      As the weeks ground on with no end to their captivity in sight, the men became so fearful, distressed, and hopeless about their situation that they contemplated taking their own lives by jumping overboard; only thoughts of their loved ones back home—and their chains—prevented them from doing so.

7.      The Coast Guard finally delivered the men to Miami after more than a month of secret detention at sea. Although the Coast Guard claims it initially apprehended the men because it suspected that they were trafficking marijuana, not even a trace of marijuana was ever found onboard the *Jossette* or on any of the men. The men were neither tried nor convicted of any drug-related offense.

8.      Instead, the men were charged under 18 U.S.C. § 2237(a)(2)(B) with providing the Coast Guard with false information about their intended destination during the Coast Guard's initial boarding of the *Jossette*. They pled guilty to that charge only because they were advised by their attorneys that doing so would guarantee their return home to their families in the shortest time possible and that fighting the charge could require them to spend additional months, if not years, in pretrial detention in a country that they never sought to enter. On August 30, 2018, after serving their sentences and spending a further two months in federal immigration detention due to delays in their removal caused by the U.S. government, the United States removed the four men to Jamaica.

9.      As a result of their initial 32-day inhumane and incommunicado detention on board Coast Guard vessels, the men suffered physical and psychological trauma, which they continue to suffer to this day. The men also returned to their families financially ruined. When the Coast Guard captured them, the officers stripped them of nearly all of their personal possessions, confiscated their national identity cards and driving and fishing licenses, and destroyed their fishing boat and equipment.

10.     The men desire and intend to return to fishing as their primary source of livelihood, which requires them to travel regularly in international waters, but fear that if they do so, their property will again be seized and destroyed and that they will again be subjected to inhumane and incommunicado detention pursuant to Coast Guard policy.

11.     Three of the men have recently returned to fishing but remain fearful of being apprehended and detained by the Coast Guard again. Mr. Weir and Mr. Patterson restrict their fishing trips to Jamaican territorial waters only and Mr. Williams to the reef a few hundred feet from his home. Mr. Ferguson remains so traumatized by the Coast Guard's destruction of his boat and his inhumane and incommunicado detention that he has not fished again since returning to Jamaica.

12.     Upon information and belief, Defendants have a policy or regular practice of interdicting small vessels in international waters, searching those vessels and their crewmembers for drugs, and destroying those vessels and detaining their crew members on U.S. Coast Guard ships under inhumane conditions and incommunicado for prolonged periods of time beyond the time reasonably necessary to bring them before a court, regardless of whether any drugs are found aboard. Plaintiffs formerly fished in international waters for a living. Plaintiffs believe that the injuries they have suffered were pursuant to Defendants' policy and practice.

13.     Plaintiffs bring this suit under general admiralty and maritime tort law to recover damages for the physical and psychological trauma they have suffered and continue to suffer as a consequence of their unlawful seizure; the Coast Guard's destruction of their boat and other property and their 32 days of inhumane and incommunicado detention by the Coast Guard. Plaintiffs also seek declaratory and injunctive relief against the Coast Guard so that they can once again freely pursue their trade as fishermen in international waters near Jamaica, without exposure to Defendants' unlawful policy and practice.

## JURISDICTION AND VENUE

14.     This court has jurisdiction under 28 U.S.C. § 1333 as the conduct complained of occurred upon navigable waters and involved conduct that had a potentially disruptive effect on maritime commerce, and the claims arise under general admiralty and maritime law. The Court has authority to grant declaratory and injunctive relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, and under the Court's inherent equitable jurisdiction.

15.     The Suits in Admiralty Act, 46 U.S.C. §§ 30901-30913 (2006) ("SIAA"), waives the United States' sovereign immunity for Plaintiffs' First and Third through Eleventh Claims for Relief, and the Public Vessels Act, 46 U.S.C. §§ 31101-31113 (2006) ("PVA"), does so for Plaintiff Ferguson's Second Claim for Relief, the Coast Guard's destruction of his fishing boat.

16.     Venue for suits under the SIAA is proper in this district under 46 U.S.C. § 30906. Non-resident aliens can "bring suit in any district on grounds that otherwise they would have no forum in which to sue."[1] Venue for suits under the PVA is proper under 46 U.S.C. § 31104, which allows "non-residents to sue in any district court in the United States."

---

[1] *Malajalian v. United States*, 504 F.2d 842, 844 (1st Cir. 1974) (collecting cases brought under the SIAA). *See also St. John Marine Co. v. United States*, 91 Civ. 4861 (SWK), 1994 WL 281937 at *5, 1994 U.S. Dist. LEXIS 8334 (S.D.N.Y. June 22, 1994) (Greek corporation with no

## PARTIES

17.     Plaintiff Robert Dexter Weir is a Jamaican citizen. Mr. Weir is a fisherman by trade. On September 14, 2017, Mr. Weir was the captain of the *Jossette*, which the Coast Guard interdicted and destroyed. Before delivering him for prosecution in Miami, the Coast Guard secretly detained and abused Mr. Weir onboard four Coast Guard ships for more than a month, until October 16, 2017. On January 4, 2018, pursuant to a plea agreement, Mr. Weir pleaded guilty to providing false information to a federal law enforcement official during a boarding of a vessel, 18 U.S.C. § 2237(a)(2)(B), and was sentenced to ten months' imprisonment. Mr. Weir currently lives in Clarendon, Jamaica, with his long-term girlfriend and his family. Mr. Weir has never been involved in trafficking drugs.

18.     Plaintiff Patrick Wayne Ferguson is a Jamaican citizen. Mr. Ferguson is a fisherman by trade, and the registered owner of the *Jossette*. On September 14, 2017, Mr. Ferguson was a member of the crew of the *Jossette* when it was interdicted and destroyed by the Coast Guard. Before delivering him for prosecution in Miami, the Coast Guard secretly detained and abused Mr. Ferguson onboard four Coast Guard ships for more than a month. On January 4, 2018, pursuant to a plea agreement, Mr. Ferguson pleaded guilty to providing false information to a federal law enforcement official during a boarding of a vessel, 18 U.S.C. § 2237(a)(2)(B), and was sentenced to ten months' imprisonment. Mr. Ferguson currently lives in Kingston, Jamaica, with his long-term girlfriend and their five children. Mr. Ferguson has never been involved in trafficking drugs.

19.     Plaintiff Luther Fian Patterson is a Jamaican citizen. Mr. Patterson is a fisherman by trade. On September 14, 2017, Mr. Patterson was a member of the crew of the *Jossette* when

---

business operations in the United States could bring suit under the SIAA in the Southern District of New York).

6

it was interdicted and destroyed by the Coast Guard. Before delivering him for prosecution in Miami, the Coast Guard secretly detained and abused Mr. Patterson onboard four Coast Guard ships for more than a month. On January 5, 2018, pursuant to a plea agreement, Mr. Patterson pleaded guilty to providing false information to a federal law enforcement official during a boarding of a vessel, 18 U.S.C. § 2237(a)(2)(B), and was sentenced to ten months' imprisonment. Mr. Patterson currently lives in Rose Hall, Jamaica, with his girlfriend. Mr. Patterson has never been involved in trafficking drugs.

20.     Plaintiff David Roderick Williams is a Jamaican citizen. Mr. Williams is a fisherman by trade. On September 14, 2017, Mr. Williams was a member of the crew of the *Jossette* when it was interdicted and destroyed by the Coast Guard. Before delivering him for prosecution in Miami, the Coast Guard secretly detained and abused Mr. Williams onboard four Coast Guard ships for more than a month. On January 4, 2018, pursuant to a plea agreement, Mr. Williams pleaded guilty to providing false information to a federal law enforcement official during a boarding of a vessel, 18 U.S.C. § 2237(a)(2)(B), and was sentenced to ten months' imprisonment. Mr. Williams currently lives in Whitehouse, Jamaica, with his long-term girlfriend and their thirteen-year-old daughter. Mr. Williams has never been involved in trafficking drugs.

21.     Pursuant to the SIAA and the PVA, Defendant United States of America is responsible for all the acts and omissions of the Coast Guard and of its personnel described below. Their conduct is attributable to Defendant because U.S. agents, the Coast Guard and/or its officers, acting within the scope of their employment, seized Plaintiffs and destroyed their fishing boat and other property while in international waters; and detained and abused Plaintiffs while they were onboard U.S.-flagged ships on international waters.

22.     Defendant Admiral Karl L. Schultz is the Commandant of the Coast Guard.  He is responsible for all world-wide Coast Guard activities and Coast Guard personnel. Defendant Schultz is sued in his official capacity for purposes of declaring unlawful and enjoining the Coast Guard's policy and practice described below.

## FACTUAL ALLEGATIONS

23.     On the night of September 13, 2017,  Plaintiffs Weir, Ferguson, Patterson, and Williams left the Half Moon Bay fishing village, near Falmouth, Jamaica, in a thirty-two foot, wood-and-fiberglass, two-engine inshore Jamaican-registered fishing boat, the *Jossette*.  Also on board was a fifth crewmember, George Garee Thompson, who is also a Jamaican national and fisherman. The crew was headed for the Morant Cays, an offshore island group located in Jamaican territorial waters about seven to eight hours from Falmouth, and a well-known place to fish at that time of year.

24.      A few days earlier, Mr. Ferguson, the owner of the *Jossette*, had arranged for fish-traps to be set in the waters surrounding the cays, and the crew of the *Jossette* was returning to retrieve fish from the traps. They were also planning to line-fish for tuna and snapper on the way there and back. The crew planned to spend the next day out on the cays and to return late the next evening, on September 14, 2017. The crew informed their family members of their plans, and their family members expected them to return by the evening of September 14.

25.     Each crewmember had his fishing gear with him and an overnight bag containing his national identity cards, fishing and driving licenses, and a change of clothing.

26.     Also onboard were Mr. Ferguson's fighting cock, Jah Roos, which Mr. Ferguson had brought with him because he did not have anyone to look after it while he was gone, and a small plastic bucket of clothes for his two-year-old daughter, France. He had purchased the

clothes earlier that day, but had not had an opportunity to drop them at his house before setting

out for Morant Cays.  He planned to give them to his daughter's mother upon his return the next

day.

27.     Several hours after leaving Half Moon Bay, an unexpected storm blew up. The

*Jossette's* main engine lost power and, reduced to using only a small 75-horsepower engine, the

boat drifted off course in the stormy seas.

28.     At first light on September 14, the crew realized that they had overshot the

Morant Cays and were lost. In the hope of finding their bearings, they decided to navigate toward

a landmass they saw far in the distance and from there find their way back home. The men did

not know that the landmass was Haiti.

29.     Later that morning, officers onboard the United States Coast Guard Cutter

*Confidence* (WMEC 619) ("*Confidence*"), spotted the *Jossette* as it headed towards Haiti. The

officers wrongly suspected that the boat and its crew were involved in trafficking drugs, and

dispatched four armed Coast Guard officers in a high-powered speedboat to stop, board, and

search the *Jossette* and its crew.

30.     The Coast Guard speedboat intercepted the *Jossette* around noon on September

14, 2017.

31.     Only when the Coast Guard speedboat pulled right alongside the *Jossette* did the

crew realize it was a Coast Guard vessel. The men saw four Coast Guard officers onboard the

speedboat, three of whom were pointing guns at them. One of them ordered the *Josette* crew to

move to the front of the boat and to place their hands where they were visible. All the men on

board the *Jossette* complied.

32.     One of the officers asked the men what their nationalities were and where the boat was registered. Each of the men responded that they were Jamaican and Mr. Weir replied that the boat was registered in Whitehouse, Jamaica. Mr. Ferguson added that he was the boat's owner. One of the officers asked the crew what they were doing in that area of the Caribbean Sea. Mr. Weir explained that the crew had left the fishing village near Falmouth intending to go fishing off the Morant Cays, but that they had gotten lost on the way and were trying to find their way back to Jamaica.

33.     Two of the Coast Guard officers boarded the *Jossette*.

34.     The men explained to the officers that they were fishermen and produced their identification. Mr. Ferguson gave the boat's registration documentation to one of the officers.

35.     The officers searched the men and the boat.  While they did so, Mr. Weir again explained to the officers that that they had gotten lost on their way to the Morant Cays where they planned to fish and that they were trying to find their way back to Jamaica. Mr. Weir asked the officers if they knew what the landmass in the distance was. One of the officers responded that it was Haiti.

36.      The two Coast Guard officers remained onboard the *Jossette* for about three or four hours, searching the boat and the crew. During this time, the *Confidence* drew close.

37.     Although the Coast Guard officers exhaustively searched each crewmember and the *Jossette* for evidence of drugs, including by using an ion-scan detection device, they found no marijuana or trace of marijuana on the *Jossette* or its crew. No marijuana or traces of marijuana were ever found on the *Jossette* or any of its crew.

38.     Despite this lack of evidence, one of the officers told the men that the Coast Guard was going to transport them from the *Jossette* to the *Confidence* where they would be detained for further investigation. The officer did not explain why.

39.     Shocked by this turn of events, the men initially refused to leave their boat. But when the officers pointed guns at them, they complied; each of the men took his overnight bag and got into the speedboat. Two Coast Guard officers remained on the *Jossette* to continue the search. As they searched, they found Jah Roos and, after obtaining orders to do so from their Commanding Officer, killed the bird. Meanwhile, the other two officers transported the men a short distance to the *Confidence*.

### Detention on the *Confidence* and Destruction of the *Jossette*

40.     Once onboard the *Confidence*, Coast Guard officers took down each of the men's names and nationalities and ordered them to remove their clothes and shoes. The Coast Guard gave each of them white paper-thin coveralls and a pair of thin, disposable slippers to wear instead.

41.     The officers confiscated the men's clothing and overnight bags.

42.     Coast Guard officers then marched the men towards the bow of the ship, where the officers chained each of them by one of their ankles to metal cables that ran the breadth and length of the ship's deck. The Coast Guard had already detained approximately thirty other men at the ship's bow.  All of them were dressed in the same white coveralls, and chained by one of their ankles to the metal cables affixed to the deck.  The Plaintiffs later learned that these men were from Latin American countries, including Panama and Honduras, and that some had already been onboard for several weeks.

43.     As darkness fell, the Plaintiffs sat chained to the deck.  They could see the *Jossette* floating nearby and watched in disbelief as a Coast Guard officer fired a flare at the *Jossette*. The boat burst into flames and then sank after Coast Guard officers riddled its hull with bullets.

44.     Shortly thereafter, the *Confidence* set sail in an eastward direction. Although the men did not know it then, this would be the beginning of more than a month of inhumane and incommunicado detention for them, chained to the decks of four different Coast Guard ships.

## Detention on the *Confidence* and at the U.S. Naval Base at Guantanamo Bay

45.     The *Confidence* sailed for about three nights and four days before it reached the U.S. Naval Base at Guantanamo Bay. For that entire period onboard the *Confidence*, the Coast Guard held the Plaintiffs in inhumane conditions. Each of them remained chained by one of their ankles to one of a number of thick metal cables that ran the length and breadth of the deck at the ship's bow. The shackles were painful, cutting into the men's ankles, and greatly restricting their movements.  While they were chained, the men could stand, sit, or lie down, only at one spot on the cable.  The only time the Coast Guard released the men from the cable was to allow them to relieve themselves in buckets or over the side of the ship.

46.     The sole shelter the Coast Guard provided the Plaintiffs with was a plastic tarpaulin that the Coast Guard had strung up and suspended over them. It provided little protection from the wind, rain, and sun.  The men's skin quickly blistered due to exposure to the constant sun, wind, and salt air.

47.     The Coast Guard failed to provide the men with even rudimentary sanitation and washing facilities. They had to urinate over the side of the ship and defecate in a metal bucket.

They were permitted only a single cold-water shower in the four days that they were aboard the *Confidence*.

48.     The Coast Guard provided the men with only a thin rubber mat to sleep on and a thin blanket.

49.     The Coast Guard provided the men with three identical meals a day: a meager ration of cold rice and beans. The only water the Coast Guard gave them to drink was briny and made them nauseous.

50.     The Coast Guard's provisions for the men's health and safety fell far below the minimum standards for multiday sea voyages. Because of the substantial risks caused by constant and prolonged exposure to the elements, the men would never spend longer than a day or two on the exposed deck of a small fishing boat such as the *Jossette* and, if they were on longer voyages, they would overnight on one of the cays where they had protection from the elements.

51.     The men repeatedly begged the Coast Guard officers guarding them to allow them to make a phone call home to their families to let them know they were still alive. The officers refused all their requests, and also refused their requests that the Coast Guard inform their families that the men had not died at sea.

52.     About four days after their capture, on or around September 18, the *Confidence* docked at the U.S. Naval Base at Guantanamo Bay. After removing the other approximately thirty men from the ship and transporting them to another part of the Naval Base, the Coast Guard also removed the *Jossette*'s crew from the *Confidence*.

53.     On information and belief, the other men previously detained on the ship were flown to Miami for criminal arraignment. But the *Jossette*'s crew was not.  Instead, Coast Guard

officers transferred them overland to a second Coast Guard ship docked elsewhere at the Naval

Base.  Following this transfer, the Coast Guard continued to subject the men to weeks of

inhumane conditions and incommunicado detention.

### Detention on Second Coast Guard Ship

54.     Plaintiffs are unaware of the name of the second ship on which the Coast Guard

detained them. Once the Coast Guard had moved the men onboard the second ship, Coast Guard

officers chained each of them by one of his ankles to a metal cable that was fixed to the deck at

the ship's bow, just as they had done onboard the *Confidence*. No other detainees were onboard

the ship.

55.     The captain of the second Coast Guard ship told the men that he had orders to

continue to detain them, but he refused to say for how long or where they were going. The men

believed that the Coast Guard was taking them back to Jamaica.

56.     The men asked the Coast Guard officers guarding them on this second vessel to

speak with their families to let them know that they were still alive.  When the officers denied

their requests, they asked the captain of the second ship to make a phone call on their behalf.  He

refused their requests, telling them that it was not permitted under Coast Guard policy.  The men

made many similar requests of other Coast Guard officers on this ship, and all their requests

were met with the same response.

57.     The Coast Guard held the men overnight chained to the deck of the ship. The next

day, on or around September 19, 2017, the ship set sail for Puerto Rico, although Hurricane

Maria, a Category 5 hurricane and the deadliest Atlantic hurricane in more than a decade, was

churning nearby.

58.    The Coast Guard detained the men on the second ship, chained outdoors on its deck, for more than a week. The conditions to which the Coast Guard subjected the men during that time were even worse than those on the *Confidence*.

59.    Even during the worst of the storm when high winds battered the men and rain and seawater constantly drenched them, the Coast Guard refused to allow the men to shelter inside the ship. The Coast Guard officers guarding the men also denied their repeated requests for a tarpaulin to shelter them, telling the men that there were no tarpaulins onboard.

60.    As the wind howled, the ship violently pitched, rolled, and swayed, and waves repeatedly crashed over the deck; the men were consumed with terror. Chained to the ship's deck and unable to protect themselves from the storm's ferocity, for hours the men feared that they would be severely injured during the storm or that the cables would break and that they would be washed overboard to their deaths.

61.    For the duration of their time on this second ship, the Coast Guard refused to provide the men with proper bedding; the Coast Guard instead gave them two thin sheets that offered little-to-no protection from the ship's rough, rusty metal deck or from the biting damp and cold during the nights and early mornings. At the beginning of their journey on this ship, before the hurricane, the men fashioned "mattresses" from cardboard that they found in the open garbage bins near where they were chained. Once the storm hit, those make-shift "mattresses" quickly became waterlogged and useless, the cardboard disintegrating as it was drenched. As a result of the pain from their shackles and lack of bedding and protection from the elements, as well as the growing fear and uncertainty about what was to happen to them, the men were barely able to sleep, during the night or day.

62.     As on the *Confidence*, the Coast Guard also did not provide the men with adequate sanitation or washing facilities on the second ship.  Instead, the men were given only a shared metal bucket for a toilet, and were permitted only to shower about two or three times in cold water. The men became caked in salt and developed painful saltwater rashes and fungal infections.

63.     The Coast Guard provided the men with food that was rancid and consisted only of small helpings of cold rice and beans. The only drinking water the Coast Guard gave the men was briny and made them nauseous.

64.     Each of the men developed ear, nose, throat, chest, and skin infections from constant exposure to the sun, heat, cold, wind, rain, and seawater. They requested medical treatment for their injuries, but the Coast Guard personnel told them that there was no doctor onboard.  Their injuries went untreated.

65.     About three days after leaving Guantanamo Bay, the ship arrived in St. Thomas, the U.S. Virgin Islands. The ship docked in the harbor there for several hours.

66.     Then the ship set sail for Puerto Rico, where about three days and three nights later, it docked at a pier in the Port of San Juan. Before reaching the pier in the Port of San Juan, despite previously refusing to provide the men with a tarpaulin for shelter during the hurricane, the Coast Guard covered the area where it was holding them with a dark tarpaulin. On information and belief, the Coast Guard deliberately used the tarpaulin to hide the men from onlookers, as the men would otherwise have been visible from the pier. Whenever one of the men attempted to lift the tarpaulin to look outside, a Coast Guard officer reprimanded them and pulled the tarpaulin down again. It was so dark under the tarpaulin that the men could barely see their hands in front of their faces.

16

67.     While in port, the Coast Guard did not allow the men to discard the contents of their metal-bucket toilet or to use the ship's indoor toilet. Instead, they had to sit next to the bucket, filled with feces, for the two days and two nights that the ship remained there.

68.     On one of those days, the men saw a Coast Guard officer talking on a cell phone. They begged and pleaded with him to allow them to make a call home to their families or at least to call their families on their behalf, but, like every other Coast Guard officer, this officer refused their requests.

69.     Increasingly suffering from the inhumane conditions of their confinement, including the pain from rashes, infections, and other ailments, distraught by the seemingly indefinite nature of their incommunicado detention, and tormented by the certainty that their families believed them to be dead, the men had recurring thoughts of killing themselves. Only thoughts of their loved ones waiting for them back home and encouragement from one another to stay strong stopped them from acting on these thoughts.

70.     After leaving the Port of San Juan, the ship sailed for a day and a night. The next day, when the men believed that they were somewhere off the coast of Puerto Rico, the Coast Guard transferred the men to a third Coast Guard ship.

**Detention on Third Coast Guard Ship**

71.     The Coast Guard detained Plaintiffs on the third ship for more than a week, until about October 13, 2017. No other detainees were held with them. On information and belief, the Coast Guard sailed the third ship off the coast of Puerto Rico this entire period.

72.     Although the men remained chained by one of their ankles to metal cables that were fixed to the ship's deck (as on the other two ships) the remaining conditions of their confinement were not as bad as on the first two ships.

73.     The Coast Guard allowed the men to sleep under a covered enclosure and provided each of them with a rubber mat to sleep on and a blanket.

74.     The Coast Guard allowed the men to use an enclosed portable toilet and to shower every other day.

75.     The Coast Guard provided the men with three meals a day that were better than the food on the other two ships; the rice and beans was supplemented with some meat or chicken, and occasionally the Coast Guard gave the men fruits and vegetables. But the water the Coast Guard provided did not improve; it was the same briny water that the Coast Guard had provided to the men on the previous ships, and it continued to make the men nauseous.  The men drank less and less water, and began to experience symptoms of dehydration, including severe exhaustion, dizziness, and headaches.

76.     The Coast Guard officers on this ship provided the men with some medical treatment for their injuries.  A medic saw each Plaintiff and provided each of them with some treatment for their physical injuries. The medic made a number of follow-up visits, treating Mr. Williams for his severe toothache and also providing him and the other men with treatment for their persistent severe headaches, ear, nose, throat, chest, and skin infections.

77.     The men continued to request to make phone calls home to their families, or for the Coast Guard to make calls on their behalf. The Coast Guard continued to refuse their requests, telling the men, as other Coast Guard officers had told them before, that such calls were against Coast Guard policy. The men continued to be tormented by thoughts of their families' excruciating and wholly unnecessary grieving.

**Detention on Fourth Coast Guard Ship**

78.    On or about October 13, 2017, the Coast Guard transferred the men to a fourth

Coast Guard ship. On information and belief, the transfer took place in the waters off Puerto

Rico. No other detainees were onboard, and the Coast Guard officers did not tell the men where

they were going or for how long they would be held. The men again requested to make a call

home, but the Coast Guard officers refused their requests.

79.    The conditions onboard the fourth ship were the worst thus far. The Coast Guard

chained the men by one of their ankles to a cable fixed to the deck on the ship's uncovered bow.

As on the other three ships, the chains were painful, cutting into the men's ankles, and made

sleeping difficult. The chains used on this ship and the other three ships cut so deeply that they

left physical scarring on the men's ankles that remained for a year and psychological scars that

are still with them.

80.    The Coast Guard detained the men in chains fully exposed to the sun, wind, and

rain at all times.

81.     The Coast Guard released the men from the cable only to use the "toilet," which

was a shared metal bucket, and only on one other occasion: to use a cold, salt-water shower after

a sewage pipe next to them burst, soaking the deck and the men in feces and other excrement.

82.    The Coast Guard provided the men only with one thin blanket each and nothing

for them to sleep on. They shivered, soaked in sewage and seawater. On this ship, as on the

others, the men barely slept because of the harsh conditions and the fear, uncertainty, and

increasing hopelessness of their situation.

83.    The only food the Coast Guard served the men consisted of small portions of rice

and beans three times a day. The food was served cold and was often rancid, making it virtually

inedible. When the men complained about it to the officers guarding them, the officers said that

there was nothing else to give them as the kitchen had run out of food. But even as they were told there was no food, the men could smell fresh meals being cooked somewhere on the deck below where the Coast Guard had chained them.

84.     At no point during the men's 32-day detention did the Coast Guard ever inform the men how long they would be held at sea or where they were to be taken.  When the ships docked at Guantanamo Bay, the U.S. Virgin Islands, and Puerto Rico, and the men remained chained to the ships' decks, they began to fear that the Coast Guard would hold them indefinitely or, worse still, kill them by throwing them overboard. This fear increased each time the ship docked and the men were placed on yet another ship, as did the men's fear that the egregious conditions would result in their death.

85.     The fourth ship docked in Miami on the afternoon of October 16, 2017, and the Coast Guard finally delivered the men into the custody of U.S. officials who introduced themselves as agents of the U.S. Drug Enforcement Administration.

86.     The men spent more than a month in inhumane, incommunicado detention, chained to the exposed decks of the four coast guard ships, wracked by fear, uncertainty and hopelessness. By the time the Coast Guard brought them to the United States, the men's physical appearances had changed dramatically. They were gaunt, and each of them had lost a significant amount of his body weight because of the lack of adequate food and water, sleep deprivation, and other physical and psychological trauma caused by the egregious conditions of their incommunicado confinement.

### The Men's Families Mourn their Relatives as Dead

87.     Meanwhile, as the Coast Guard detained the Plaintiffs for weeks, their families became increasingly concerned for their safety after the men did not return home on September

15, 2017 as expected. Some of their family members made inquiries with the Jamaican Police

and Coast Guard, filing missing-person reports on their loved ones' disappearance; others made

inquiries with local government officials and other fishermen in the area.  In desperation, some

family members posted Facebook notices seeking information on the men's whereabouts.  All of

these efforts were to no avail.

88.     As the weeks went by with no word from the men, some family members

considered them lost at sea, and mourned their deaths. Mr. Weir's family began to give away his

clothes and other personal possessions, and neighbors began taking his livestock, including

goats, pigs, and chickens. Mr. Ferguson's family gave away his vehicle, as did Mr. Patterson's,

together with his herd of fifteen goats. And Mr. Williams' family gave away many of his clothes

and personal possessions and began to make arrangements for his funeral.

### Arrest and Detention in the United States

89.     On October 18, 2017, the United States charged Plaintiffs in a Criminal

Complaint with one count each of conspiracy to possess with intent to distribute marijuana, in

violation of 46 U.S.C. §§ 70503(a)(1) and 70506(b). The men pleaded not guilty to these charges

and were detained pending trial.

90.     On December 13, 2017, the United States filed an Information, which charged the

men with "knowingly and intentionally provid[ing] materially false information to a Federal law

enforcement officer during a boarding of a vessel regarding the vessel's destination," in violation

of 18 U.S.C. § 2237(a)(2)(B). And, on January 4 and 5, 2018, pursuant to written plea

agreements, the men each pleaded guilty to this charge. Specifically, the plea agreements

stipulated that they claimed that their destination was the waters near the coast of Jamaica where

they intended to fish when they were in fact destined for Haiti. A federal court sentenced them each to ten months' imprisonment.

91.     In fact, the men had not lied to the Coast Guard officers on the *Jossette*. They pleaded guilty because they were told that it was the quickest and surest way to get back to their homes and families in Jamaica and to put an end to their nightmare.

92.     At their sentencing hearing the Assistant U.S. Attorney prosecuting their case acknowledged that it would, in fact, have taken "a miracle" to prove to a jury that there were ever any drugs on the men's boat, one that he "could not have pulled off."

93.     On August 30, 2018, after serving their sentences and spending a further two months in federal immigration detention due to delay caused by the U.S. government, the United States removed the men to Jamaica.

**The Men's Return Home and the Ongoing Effects of their Ordeal**

94.     In the months since the men returned to their homes and families in Jamaica, the four Plaintiffs, Mr. Weir, Mr. Ferguson, Mr. Patterson, and Mr. Williams, all continue to suffer the physical and psychological effects of the trauma of their 32-day inhumane and incommunicado detention by the Coast Guard. They have also suffered and continue to suffer financial hardship as a consequence of that detention.

95.     Since their return to Jamaica, Mr. Weir, Mr. Patterson, and Mr. Williams have returned to the sea to go fishing but, fearful that the Coast Guard will again capture and detain them, they fish only in Jamaican territorial waters and never venture into international waters. Mr. Williams only fishes on the reef and a few hundred meters from shore. The catch in Jamaican territorial waters is small and consequently significantly less lucrative compared to the catch in international waters, and the men cannot make a living this way. Mr. Ferguson has not

ventured out to sea at all because he fears he may again be captured, detained, and mistreated by the Coast Guard.

96.     Mr. Weir suffers from intrusive thoughts and recollections about his detention by the Coast Guard. Although he tries not to think about the trauma of that time, he cannot put the horrific experience behind him. Since his return home, Mr. Weir has struggled to make ends meet. His main source of income is from fishing, and he has only been able to return to the sea to fish since March 2019 and has restricted his destinations to fishing within close proximity to the Jamaican mainland, where the Jamaican Coast Guard is stationed thus substantially limiting the amount of his catch and the money he can earn from its sale. Between this limitation on his fishing income, the loss of a livestock business that he used to run together with his girlfriend before his disappearance, and the forced breakup of his household with his girlfriend, Mr. Weir has suffered substantial financial setbacks as a result of his unlawful detention by the U.S. Coast Guard.

97.     Mr. Ferguson suffers persistent disturbing flashbacks to his time on the Coast Guard ships and in particular to the time he saw the Coast Guard destroy his boat. The Coast Guard's destruction of his boat and fishing gear and the loss of twenty-five fishing traps have resulted in the loss of his livelihood and therefore a significant loss of income to support his family. He now relies on the financial support of his extended family.

98.     Mr. Patterson suffers from intrusive recollections and memories of his time spent on the Coast Guard ships.  He still feels the steely grip of the chain on his ankles, and at times he cannot sleep thinking about how the Coast Guard abused him.  Since his return to Jamaica, Mr. Patterson has struggled financially with the loss of his car and livestock while he was detained, and he has not yet found a regular spot on a fishing crew because most crews require travel into

international waters, which Mr. Patterson fears to do because of his fear that the Coast Guard will again seize, detain and mistreat him, resulting in a significant loss of income from a reduced catch.

99.     Mr. Williams suffers intrusive recollections and memories of his inhumane and incommunicado detention by the Coast Guard. Since returning home, Mr. Williams has struggled to pull his life back together and to provide for his family.  His only source of income is from small quantities of fish he catches on reefs close to shore and sells in the local market. Mr. Williams does not venture further offshore because he fears he will again be captured, detained and mistreated by the Coast Guard.

### The Coast Guard's Seizure of Plaintiffs, Destruction of their Property and its Inhumane Treatment and Incommunicado Detention of them is Coast Guard Policy

100.     On information and belief, the Coast Guard's seizure of Plaintiffs, destruction of their property and its inhumane treatment and incommunicado detention of them was not aberrational, but was carried out pursuant to Coast Guard policy. *See e.g.* Seth F. Wessler, *The Coast Guard's 'Floating Guantanamos'*, N.Y. Times Magazine (Nov. 20, 2017), https://nyti.ms/2AWpsgV.

101.     Specifically, that policy involves the Coast Guard's interdiction of small vessels in international waters; searches of those vessels and their crewmembers for drugs; the destruction of those vessels; and the Coast Guard's detention of their crew members on U.S. Coast Guard ships under inhumane conditions and incommunicado for prolonged periods of time beyond the time reasonably necessary to bring them before a court, regardless of whether any drugs are found aboard.

102.     On information and belief, the Coast Guard's policies, practices, or procedures at issue in this case remain in effect and many other foreign nationals have been, and continue to be, subjected to them.

103.     Absent a revocation and prohibition of the Coast Guard's policies, practices, or procedures, as well as implementation of alternative affirmative policies, practices, or procedures ensuring compliance with the requirements of law, Plaintiffs and many other foreign nationals remain at risk of unlawful seizure and destruction of their property and of inhumane treatment and incommunicado detention by the Coast Guard.

104.     Plaintiffs desire to return to their livelihood of fishing in international waters but remain reasonably fearful that, because of Defendants' policy and practice, if and when they do the Coast Guard will again seize them, destroy their property, and subject them to inhumane and incommunicado detention, even if they have done nothing wrong.

## CAUSES OF ACTION

### First Claim for Relief
### False Imprisonment

105.     Defendant United States, acting through its agents the Coast Guard and/or Coast Guard officers acting within the scope of their employment, intentionally and unlawfully confined Plaintiffs on board four Coast Guard ships without their consent.

106.     Even if it were initially privileged, Defendant United States' confinement of Plaintiffs was not privileged for the entire thirty-two days of their inhumane and incommunicado detention on the four Coast Guard ships. If at all, Defendant United States' confinement of Plaintiffs was privileged only for a reasonable time before Defendant presented them before a

federal judicial officer. Thirty-two days far exceeds any reasonable time. Defendant could have delivered Plaintiffs to federal custody or presented them before a U.S. magistrate on criminal charges at multiple times, weeks before it did so, including when the Coast Guard ships on which Defendant detained Plaintiffs were docked at the U.S. Naval Base at Guantanamo Bay; St. Thomas, the U.S. Virgin Islands; and the Port of San Juan, Puerto Rico. In St. Thomas and Puerto Rico, Defendants could have taken Plaintiffs directly to a local U.S. district court. And Defendants could have transported Plaintiffs to Miami from any of these locations, where they could have been presented before a magistrate.

107.    Plaintiffs are entitled to compensatory damages for their false imprisonment.

108.    Defendant United States' conduct was deliberate, willful, intentional, wanton, malicious, oppressive, and/or in conscious disregard for Plaintiffs' rights under general maritime law and should be punished by an award of punitive damages in an amount to be determined at trial.

## Second Claim for Relief
## Negligence

109.    Defendant United States owed Plaintiffs a duty of reasonable care while they were in its custody from September 14, 2017 until October 16, 2017 aboard Coast Guard ships in international waters.

110.    That duty required Defendant, acting through its agents the Coast Guard and/or its officers acting within the scope of their employment, to take reasonable measures to avoid causing Plaintiffs physical and psychological injury while they were detained onboard Coast Guard ships and to prevent Plaintiffs from suffering such injuries as could have been prevented by exercising reasonable care.

111.    Defendant failed to exercise reasonable care in detaining Plaintiffs on board four Coast Guard ships by: (i) holding the men for longer than was necessary before presenting them before a magistrate to be criminally charged; (ii) chaining Plaintiffs to the exposed decks of those ships for more than a month in a manner that unnecessarily caused them significant physical and mental pain and suffering; (iii) failing to provide Plaintiffs with adequate shelter from the elements for more than a month, including during a hurricane; (iv) failing to provide Plaintiffs with adequate sanitation and washing facilities for more than a month; (v) failing to provide Plaintiffs with adequate food and water for more than three weeks; (vi) failing to provide Plaintiffs with proper bedding for more than three weeks; and (vii) failing to provide Plaintiffs with adequate medical treatment for injuries Plaintiffs sustained while onboard.

112.    The prolonged detention and conditions to which Defendant United States subjected Plaintiffs were not incidental to the Coast Guard's purpose of transporting Plaintiffs to the United States for prosecution.

113.    Defendant United States negligently detained Plaintiffs far longer than was reasonably necessary to transport them from the point of their apprehension in the Caribbean Sea to the United States for criminal prosecution. Defendant could have arrested and charged Plaintiffs when Defendant had them in its custody at multiple points, including at the U.S. Naval base at Guantanamo Bay on or around September 18, 2017, at St. Thomas, the U.S. Virgin Islands on or around September 22, 2017, and at the Port of San Juan, Puerto Rico, on or around September 27, 2017.

114.    Defendant acting through its agents the Coast Guard and/or its officers acting within the scope of their employment directly created and perpetuated the conditions under which Plaintiffs were detained. Defendant's negligence proximately caused Plaintiffs' physical

and psychological injuries, including skin, ear, nose, and throat infections, rashes, weight loss, sleeplessness, nightmares, flashbacks, intrusive memories and recollections, and other physical and psychological pain and suffering.

115.   Plaintiffs are entitled to compensatory damages for these injuries.

### Third Claim for Relief
### Conversion

116.   Defendant United States acting through its agents the Coast Guard and/or its officers acting within the scope of their employment intentionally destroyed Plaintiff Ferguson's boat, the *Jossette*, and all of its contents, including its engines, its equipment, the crew's fishing gear, Plaintiff Ferguson's fighting cock, Jah Roos, and the plastic bucket of clothes for his two-year-old daughter, by setting it on fire, riddling it with bullets, and causing it to sink immediately after the Coast Guard had detained Plaintiffs and conducted exhaustive searches of Plaintiffs and the *Jossette* that found no marijuana or traces of marijuana on Plaintiffs or on the *Jossette*. Defendant United States had no lawful justification for destroying Plaintiff Ferguson's boat and its contents.

117.   Defendant's actions were intentionally undertaken to cause the *Jossette* to sink, which necessarily deprived Plaintiff Ferguson of the possession and use of the *Jossette* and its contents.

118.   Defendant's conduct caused Plaintiff Ferguson to suffer property losses and all four Plaintiffs to suffer tangible losses of their present and future livelihoods.

119.   Plaintiffs are entitled to compensatory damages for these losses.

**Fourth Claim for Relief**
**Battery**

120.     Defendant United States acting through its agents the Coast Guard and/or its officers acting within the scope of their employment, caused harmful or offensive contact with Plaintiffs by chaining Plaintiffs outdoors on the uncovered decks of Coast Guard ships for 32 days in a manner that unnecessarily caused them significant physical and mental pain and suffering. Defendant United States intended to cause this harmful or offensive contact with Plaintiffs.

121.     Plaintiffs are entitled to compensatory damages for these batteries.

122.     The conduct of Defendant United States was deliberate, willful, intentional, wanton, malicious, oppressive, and/or in conscious disregard for Plaintiffs' rights under general maritime law and should be punished by an award of punitive damages in an amount to be determined at trial.

**Fifth Claim for Relief**
**Assault**

123.     Defendant United States acting through its agents the Coast Guard and/or its officers acting within the scope of their employment intended to cause harmful or offensive contact to Plaintiffs and caused them to be in imminent apprehension of such contact.

124.     Defendant United States caused Plaintiffs to imminently apprehend such contact by: (i) chaining Plaintiffs to the exposed decks of Coast Guard ships for more than a month in a manner that unnecessarily caused them significant physical and mental pain and suffering; (ii) failing to provide Plaintiffs with adequate shelter from the elements for more than a month; (iii) failing to provide Plaintiffs with adequate sanitation and washing facilities for more than a month; (iv) failing to provide Plaintiffs with adequate food and water for more than three weeks;

(v) failing to provide Plaintiffs with proper bedding for more than three weeks; and (vi) failing to provide Plaintiffs with adequate medical treatment for injuries Plaintiffs sustained while onboard Coast Guard ships.

125.     Plaintiffs are entitled to compensatory damages for these assaults.

126.     The conduct of Defendant United States was deliberate, willful, intentional, wanton, malicious, oppressive, and/or in conscious disregard for Plaintiffs' rights under general maritime law and should be punished by an award of punitive damages in an amount to be determined at trial.

**Sixth Claim for Relief**
**Intentional Infliction of Emotional Distress**

127.     By subjecting Plaintiffs to inhumane conditions of confinement and prolonged incommunicado detention for more than a month, Defendant United States acting through its agents the Coast Guard and/or its officers acting within the scope of their employment intended to, and did, inflict severe emotional distress upon Plaintiffs.

128.     The conduct of Defendant United States, whether intentional, reckless, or both, was extreme and outrageous, demonstrating complete disregard for and deliberate indifference to Plaintiffs' safety and well-being while Defendant held Plaintiffs onboard four Coast Guard ships for more than a month.

129.     In addition to the length and conditions of their confinement on the four Coast Guard ships, Defendant's repeated refusal to advise Plaintiffs of the lawful basis for, and expected length of, their detention, or to allow them to contact their families or even to contact Plaintiffs' families on Plaintiffs' behalf, foreseeably caused Plaintiffs extreme emotional distress. For the duration of their captivity, Plaintiffs feared that the Coast Guard would kill them by throwing them overboard or that they would die as a result of the egregious conditions of their

30

confinement. Plaintiffs also feared imminent death by drowning or serious bodily injury when the Coast Guard refused them shelter inside the second Coast Guard ship during a hurricane. This conduct caused Plaintiffs further extreme emotional distress. The emotional distress to which the Coast Guard and its officers acting within the scope of their employment subjected Plaintiffs resulted in debilitating physical and psychological injuries, including weight-loss, sleeplessness, nightmares, flashbacks, intrusive memories and recollections, and suicidal thoughts.

130.    Plaintiffs are entitled to compensatory damages for this emotional distress.

131.    The conduct of Defendant United States was deliberate, willful, intentional, wanton, malicious, oppressive, and/or in conscious disregard for Plaintiffs' rights under general maritime law and should be punished by an award of punitive damages in an amount to be determined at trial.

**Seventh Claim for Relief**
**Negligent Infliction of Emotional Distress**

132.    Defendant United States acting through its agents the Coast Guard and/or its officers acting within the scope of their employment must act with reasonable care in implementing government policies and owed Plaintiffs a duty of reasonable care during the time Plaintiffs were in its custody.

133.    Defendant failed to exercise reasonable care in detaining Plaintiffs by detaining them longer than reasonably necessary to transport them from the Caribbean Sea to the United States or its territories and under egregious, deliberately inhumane and punitive conditions.

134.    Specifically, Defendant United States refused to allow Plaintiffs to contact their families, or to contact Plaintiffs' families on their behalf, which Plaintiffs knew would cause their families to presume that they were dead. Defendant also subjected Plaintiffs to inhumane

conditions of confinement, including prolonged and painful chaining on the exposed decks of

Coast Guard ships; inadequate sanitation and washing facilities; inadequate food and water;

inadequate bedding; and inadequate medical treatment for physical and psychological injuries

sustained onboard. During their captivity, Plaintiffs feared that the Coast Guard would kill them

by throwing them overboard or that they would die as a result of the egregious conditions of their

confinement. Plaintiffs also feared imminent death by drowning or serious bodily injury when

the Coast Guard refused them shelter inside the second Coast Guard ship during a hurricane.

This conduct caused Plaintiffs further extreme emotional distress.

135.    Defendant's failure to exercise reasonable care proximately caused Plaintiffs to

suffer intense emotional distress while detained by the Coast Guard.

136.    Plaintiffs continue to suffer from severe psychological and emotional distress.

137.    Plaintiffs' psychological and emotional distress has manifested in physical injury

including weight loss, sleeplessness, nightmares, flashbacks, intrusive memories and

recollections, and suicidal thoughts.

138.    Plaintiffs are entitled to compensatory damages for this emotional distress.

**Eighth Claim for Relief**
**Forced Disappearance in Violation of Customary International Law**

139.    Defendant United States acting through its agents the Coast Guard and/or its

officers acting within the scope of their employment, forcibly disappeared Plaintiffs by

apprehending and secretly detaining them onboard four Coast Guard ships for more than one

month.

140.    During that time, Defendant did not notify Plaintiffs' families of their detention,

and refused to allow Plaintiffs to let their families know of their detention.

141.    The prohibition of forced disappearances is a norm of customary international law that forms part of federal common law, and its violation gives rise to a maritime tort cause of action.

142.    Defendant's conduct caused Plaintiffs to suffer physical, psychological, and emotional damage.

143.    Plaintiffs are entitled to compensatory damages for their forced disappearance.

144.    Defendant's conduct was deliberate, willful, intentional, wanton, malicious, oppressive, and/or in conscious disregard for Plaintiffs' rights and those of their families guaranteed by international law and federal common law and should be punished by an award of punitive damages in an amount to be determined at trial.

**Ninth Claim for Relief**
**Cruel, Inhuman or Degrading Treatment in Violation of Customary International Law**

145.    Defendant United States acting through its agents the Coast Guard and/or its officers acting within the scope of their employment, subjected Plaintiffs to cruel, inhuman, and degrading treatment when it detained them by chaining them to the exposed decks of four Coast Guard ships for more than four weeks and when it deprived them of shelter from the elements, adequate food and potable water, proper sanitation and washing facilities, bedding materials, and medical treatment for physical, psychological and emotional injuries they sustained on board.

146.    The prohibition of cruel, inhuman, or degrading treatment is a norm of customary international law that forms part of federal common law and its violation gives rise to a maritime tort cause of action.

147.    Defendant's conduct caused Plaintiffs to suffer physical, psychological, and emotional damage.

148.    Plaintiffs are entitled to compensatory damages for this cruel, inhuman, and degrading treatment.

149.    Defendant's conduct was deliberate, willful, intentional, wanton, malicious, oppressive, and/or in conscious disregard for Plaintiffs' rights guaranteed by international law and federal common law and should be punished by an award of punitive damages in an amount to be determined at trial.

**Tenth Claim for Relief**
**Prolonged Arbitrary Detention in Violation of Customary International Law**

150.    Defendant United States acting through its agents the Coast Guard and/or its officers acting within the scope of their employment subjected Plaintiffs to prolonged arbitrary detention when it secretly detained them for more than a month without charging or notifying them of the charges against them. and when it held them for the duration of that time on its ships in patently inhumane conditions, without access to family members, a lawyer, or a consular representative.

151.    The prohibition of prolonged arbitrary detention is a norm of customary international law that forms part of federal common law and its violation gives rise to a maritime tort cause of action.

152.    Defendant's conduct caused Plaintiffs to suffer physical, psychological, and emotional damage.

153.    Plaintiffs are entitled to compensatory damages for this prolonged arbitrary detention.

154.    Defendant's conduct was deliberate, willful, intentional, wanton, malicious, and oppressive, and/or in conscious disregard for Plaintiffs' rights guaranteed by international and

the common law and should be punished by an award of punitive damages in an amount to be determined at trial.

### Eleventh Claim for Relief
### Declaratory and Injunctive Relief for Defendant United States' and Defendant Schultz's Violations of Maritime Law

155.    There is a real and actual controversy between Plaintiffs and Defendant United States and Defendant Schultz as to whether Defendants have violated Plaintiffs' legal rights under maritime law as a result of the facts alleged above, including Defendants' seizure of Plaintiffs and destruction of their boat and other property and Defendants' inhumane treatment and incommunicado detention of Plaintiffs.

156.    Plaintiffs reasonably fear that they are at risk of, and will again be subjected to, Defendant United States' and Defendant Schultz's unlawful actions, and they seek (1) a judicial declaration that Defendants' conduct deprived them of their rights under maritime law, and (2) injunctive relief (a) preventing Defendants from using such unlawful practices in the future, and (b) requiring Defendants to implement an alternative policy, practice, or procedure, consistent with the requirements of maritime law, for the Coast Guard's at-sea seizure of persons suspected of wrong-doing, destruction of their property, and the detention and treatment of the persons it seizes and holds on Coast Guard ships.

157.    Absent declaratory and injunctive relief, Plaintiffs will suffer irreparable injury. They have no adequate remedy at law.

158.    The Court should grant declaratory and injunctive relief and any further necessary and proper relief as set forth below, pursuant to 28 U.S.C. §§ 2201, 2202, *Ex parte Young*, 209 U.S. 123 (1908), and the SIAA.

## PRAYER FOR RELIEF

WHEREFORE, PLAINTIFFS RESPECTFULLY REQUEST THAT THE COURT:

a.      Award compensatory and punitive damages for violations of maritime law in an amount that is fair, just, and reasonable;

b.      Declare that the acts alleged herein are unlawful and violate maritime law;

c.      Declare that the Coast Guard policy, practice, or procedures alleged herein is unlawful and violates maritime law;

d.      Enjoin the Coast Guard's future use of the unlawful policy, practice, and procedures alleged herein;

e.      Order the Coast Guard to implement alternative policies, practices, or procedures that are consistent with the requirements of maritime law;

f.      Award Plaintiffs their reasonable attorney's fees and costs; and

g.      Grant such other appropriate relief as may be just and proper.


Respectfully submitted,

 /s/ *Jonathan Hafetz*
Jonathan Hafetz (D.C. Bar No. NY0251)
Dror Ladin (D.C. Bar No. NY0277)
Steven M. Watt*
American Civil Liberties Union
Foundation
125 Broad Street, 18th Floor
New York, NY, 10004
(212) 519-7870
swatt@aclu.org

Joshua S. Sohn*
Patrick N. Petrocelli*
Sarah M. Roe*
Stroock & Stroock & Lavan LLP

180 Maiden Lane
New York, NY 10038
(212) 806-6006
jsohn@stroock.com

Cecillia D. Wang**
American Civil Liberties Union
Foundation
39 Drumm Street
San Francisco, CA 94111
(415) 343-0775
cwang@aclu.org

Arthur B. Spitzer (D.C. Bar No. 235960)
American Civil Liberties Union
of the District of Columbia
915 15th Street, NW – 2nd floor
Washington, DC 20005
(202) 601-4266
aspitzer@acludc.org

*Pro hac vice pending
** Admission pending