UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

ROBERT DEXTER WEIR et al.,

                    Plaintiffs,

        v.                                          Civil Action No. 19-1708 (TFH)

UNITED STATES OF AMERICA, et al.,

                    Defendants.

**MEMORANDUM IN SUPPORT OF
THE UNITED STATES' MOTION TO DISMISS**

JOSEPH H. HUNT
Assistant Attorney General

JESSIE K. LIU (D.C. Bar 472845)
United States Attorney

DOUGLAS M. HOTTLE
JILL DAHLMANN ROSA (D.C. Bar 451578)
Senior Trial Counsel
THOMAS M. BROWN
JUSTIN R. JOLLEY
Trial Attorneys
U.S. Department of Justice
Civil Division, Torts Branch
Aviation & Admiralty Litigation
P.O. Box 14271
Washington, DC 20044
Tel: (202) 616-4100

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... iii

TABLE OF ATTACHMENTS ......................................................................................... vii

MEMORANDUM OF POINTS AND AUTHORITIES ..................................................... 1

INTRODUCTION ............................................................................................................ 1

BACKGROUND .............................................................................................................. 3

    A.   International Framework ........................................................................... 3

        (1)  1988 Vienna Counter-Trafficking Convention ...................................... 3

        (2)  United States/Jamaica Bilateral Agreement ......................................... 5

    B.   Domestic Framework ............................................................................... 6

FACTS ............................................................................................................................. 8

    A.   Jamaica's Waiver of Jurisdiction ............................................................. 8

    B.   The Criminal Action, S.D. Florida .......................................................... 9

ARGUMENT .................................................................................................................. 12

I.     THIS CASE IS NONJUSTICIABLE UNDER THE POLITICAL QUESTION
       DOCTRINE ......................................................................................... 13

    A.   The Challenged Acts ............................................................................. 14

    B.   The Challenged Acts Were Committed to the Political Branches. ............... 15

    C.   Actions Taken Pursuant to 1988 Vienna Counter-Trafficking Convention and
        Bilateral Agreement with Jamaica Are Not Subject to Judicial Review ...... 21

    D.   The Court Lacks Judicially Discoverable and Manageable Standards for
        Resolving the Conflict. .......................................................................... 24

    E.   Prudential Factors Apply Here. ............................................................... 28

    F.   Plaintiffs' Tort Allegations Are Not Extricable and Do Not Make this Case
        Justiciable. ............................................................................................ 29

II.    OTHER GROUNDS FOR DISMISSAL .................................................. 29

CONCLUSION .............................................................................................................. 31

TABLE OF AUTHORITIES

**Cases**

*Aktepe v. United States*,
  105 F.3d 1400 (11th Cir. 1997) ...................................................................... 18, 26

*Ali Jaber v. United States*,
  155 F. Supp. 3d 70 (D.D.C. 2016) ......................................................................... 16

*Al-Tamimi v. Adelson*,
  916 F.3d 1 (D.C. Cir. 2019) .............................................................. 12, 14, 16, 28

*Am. Ins. Ass'n v. Garamendi*,
  539 U.S. 396 (2003) ............................................................................................... 16

*Baker v. Carr*,
  369 U.S. 186 (1962) ......................................................................................... 13, 24

*Bancoult v. McNamara*,
  445 F.3d 427 (D.C. Cir. 2006) ............................................................................... 16

*Benvenuti v. Dep't of Def.*,
  587 F. Supp. 348 (D.D.C. 1984) ........................................................................... 31

*Chaser Shipping Corp. v. United States*,
  649 F. Supp. 736 (S.D.N.Y. 1986), *aff'd*, 819 F.2d 1129 (2d Cir. 1987) ................ 27

*El-Shifa Pharm. Indus. Co. v. United States*,
  402 F. Supp. 2d 267 (D.D.C. 2005) ....................................................................... 17

*El-Shifa Pharm. Indus., Co. v. United States*,
  559 F.3d 578 (D.C. Cir. 2009) ............................................................................... 17

*El-Shifa Pharm. Indus., Co. v. United States*,
  607 F.3d 836 (D.C. Cir. 2010) ............................................................................... 17

*Ferguson v. United States*,
  No. 19-cv-22901 (S.D. Fla. filed July 12, 2019) .................................................. 12

*Fleming v. Cherokee Nation*,
  No. 19-cv-1397, 2019 WL 2327814 (D.D.C. May 31, 2019) ............................... 13

*Harbury v. Hayden*,
  522 F.3d 413 (D.C. Cir. 2008) ............................................................................... 18

*Japan Whaling Ass'n v. Am. Cetacean Soc.*,
478 U.S. 221 (1986) ................................................................................ 13

*Jerome Stevens Pharm., Inc. v. Food & Drug Admin.*,
402 F.3d 1249 (D.C. Cir. 2005).............................................................. 13

*Klinghoffer v. S.N.C. Achille Lauro*,
937 F.2d 44 (2d Cir. 1991) .................................................................... 29

*Lin v. United States*,
561 F.3d 502 (D.C. Cir. 2009)................................................................ 14

*Rempfer v. Sharfstein*,
583 F.3d 860 (D.C. Cir. 2009)................................................................ 13

*Schneider v. Kissinger*,
310 F. Supp. 2d 251 (D.D.C. 2004)........................................................ 18

*Schneider v. Kissinger*,
412 F.3d 190 (D.C. Cir. 2005)................................................................ 18

*Shuler v. United States*,
531 F.3d 930 (D.C. Cir. 2008)................................................................ 31

*Sosa v. Alvarez-Machain*,
542 U.S. 692 (2004) ............................................................................... 22

*Sparrow v. United Air Lines, Inc.*,
216 F.3d 1111 (D.C. Cir. 2000).............................................................. 12

*Tarros S.p.A. v. United States*,
982 F. Supp. 2d 325 (S.D.N.Y. 2013) ............................................. 22, 26

*Trudeau v. Fed. Trade Comm'n*,
456 F.3d 178 (D.C. Cir. 2006)................................................................ 13

*United States v. Brant-Epigmelio*,
2010 WL 557283 (M.D. Fla. 2010)........................................................ 23

*United States v. Carvajal*,
924 F. Supp. 2d 219 (D.D.C. 2013)..................................................... 6, 7

*United States v. Gaubert*,
499 U.S. 315 (1991) ............................................................................... 30

*United States v. Hernandez,*
    864 F.3d 1292 (11th Cir. 2017) ...................................................................... 23, 28

*United States v. Miranda,*
    780 F.3d 1185 (D.C. Cir. 2015) ............................................................................ 23

*United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines),*
    467 U.S. 797 (1984) .............................................................................................. 30

*United States v. Weir,*
    No. 17-cr-20877-UNGARO (S.D. Fla.) .................................................................. 9

*Weir v. United States,*
    No. 19-cv-23420 (S.D. Fla. filed August 15, 2019) .............................................. 12

*Wu Tien Li-Shou v. United States,*
    777 F.3d 175 (4th Cir. 2015), *cert. denied* 136 S.Ct. 139 (2015) ..................... 25, 29

*Zivotofsky v. Clinton,*
    566 U.S. 189 (2012) .............................................................................................. 13

**Constitution**
U.S. Const. art. I, § 8 ................................................................................................... 17

**Statutes**
18 U.S.C. § 2237 ............................................................................................... 9, 24, 28

46 U.S.C. § 30903 ............................................................................................... 18, 37

46 U.S.C. § 31102 ........................................................................................................ 37

46 U.S.C. § 31111 ........................................................................................................ 36

46 U.S.C. § 70501 ................................................................................................. 8, 9, 24

46 U.S.C. § 70502 .................................................................................... 8, 24, 28, 34

46 U.S.C. § 70505 ........................................................................................................ 28

Maritime Drug Law Enforcement Act, Pub. L. No. 96-350, 94 Stat. 1159 (1986) ....................... 9

**Federal Rules**
Fed. R. Civ. P. 12(b)(1) ............................................................................................... 1, 38

Fed. R. Civ. P. 38(e) ...................................................................................................... 18

**Other Authorities**

*Agreement Between the Gov't of the United States of Am. & the Gov't of Jamaica
  Concerning Cooperation in Suppressing Illicit Mar. Drug Trafficking, Feb. 6, 2004,
  T.I.A.S. No. 98-310, *available at* https://www.state.gov/98-310.................................... *passim*

Exec. Order No. 13773, *Enforcing Federal Law with Respect to Transnational Criminal
  Organizations and Preventing International Trafficking*, 82 Fed. Reg. 10691,
  2017 WL 568296 (Feb. 9, 2017) .................................................................. 7, 8, 19

*United Nations Convention Against Illicit Traffic in Narcotic Drugs and Psychotropic
  Substances (Vienna, 1988), Dec. 20, 1988, 1582 U.N.T.S. 95, 28 I.L.M. 493, *available at*
  https://treaties.un.org/Pages/CTCTreaties.aspx?id=6&subid=A&clang=_en.................. *passim*

**Secondary Sources**

Fern Kletter, 35 A.L.R. Fed. 3d Art. 6 (2018) .............................................................. 3

*Political and Policy Aspects of the Jamaica/United States Shiprider Negotiations*,
  43 Caribbean Quarterly 34 (Sept. 1997).................................................................... 5

Restatement (Fourth) of Foreign Relations Law § 310 (Am. Law Inst. 2018).................... 4, 6, 22

TABLE OF ATTACHMENTS

A:    United States of America, Department of State, Certification for the Maritime Drug Law
      Enforcement Act Case Involving Go Fast Vessel JOSSETTE.WH.478 (Jamaica) Federal
      Drug Identification Number (FDIN) – 2017972888 (Nov. 3, 2017)

B:    U.S. District Court, S.D. Florida, Case No. 1:17-cr-20877-UU, ECF 1, Criminal Cover
      Sheet and Criminal Complaint, United States of America v. Robert Dexter Weir, Patrick
      W. Ferguson, David Roderick Williams, Luther Fian Paterson, and George Garee
      Thompson (October 18, 2017)

C:    U.S. District Court, S.D. Florida, Case No. 1:17-cr-20877-UU, ECF 58, Weir Plea
      Agreement (Jan. 4, 2018)

D:    U.S. District Court, S.D. Florida, Case No. 1:17-cr-20877-UU, ECF 59, Weir Factual
      Proffer (Jan. 4, 2018)

E:    U.S. District Court, S.D. Florida, Case No. 1:17-cr-20877-UU, ECF 93, Transcript of
      Plea Colloquy and Sentencing Proceedings Before the Honorable Ursula Ungaro, U.S.
      District Judge, January 3, 2018 (filed May 18, 2018)

F:    U.S. District Court, S.D. Florida, Case No. 1:17-cr-20877-UU, ECF 90, Unopposed
      Motion to Correct Supplemental Report for Bureau of Prisons (May 3, 2018);
      Attachment 90-2, Statement of Officer Tyler Barkley regarding the Boarding of Go Fast
      Vessel Jossette on 14SEP2017 (Sept. 15, 2017)

## MEMORANDUM OF POINTS AND AUTHORITIES

Defendants (collectively, "United States") submit this Memorandum of Points and Authorities in support of their motion to dismiss the Complaint.  Fed. R. Civ. P. 12(b)(1).

## INTRODUCTION

The United States is a party to the United Nations Convention against Illicit Traffic in Narcotic Drugs and Psychotropic Substances (Vienna, 1988).  The United States is also a party to a Bilateral Agreement with the Government of Jamaica, entered in 1997, in which both parties recognized the duty of each State to cooperate with its foreign partners in the suppression of illicit maritime trafficking.  The parties to these treaties recognized that illicit trafficking and organized crime undermine legitimate economies and threaten the stability, security, and sovereignty of States.[1]  They agreed that eradication of illicit trafficking is a collective responsibility of all States, and further agreed to cooperate and coordinate their actions to suppress illicit trafficking by sea.

Operating in international waters, the U.S. Coast Guard intercepted Plaintiffs' vessel on suspicion of smuggling narcotics, at which time Plaintiffs claimed Jamaican citizenship and Jamaican nationality for the vessel.  At that point, the United States engaged in the diplomatic practice of State-to-State communication pursuant to the treaties, which resulted in Jamaica's confirming nationality for the vessel JOSSETTE and ultimately waiving its primary right to exercise jurisdiction so that the United States could enforce United States law.  The U.S. Department of State later certified the result of this diplomacy.  The Government of Jamaica took twenty-five days to make the significant decision to waive its primary right to jurisdiction, and

---

[1] Preamble, United Nations Convention against Illicit Traffic in Narcotic Drugs and Psychotropic Substances (Vienna, 1988), Dec. 20, 1988, 28 I.L.M. 493, 497.

1

thereafter allowed the United States to prosecute the case under U.S. law.  After Jamaica waived jurisdiction, the Coast Guard delivered Plaintiffs from the Caribbean Sea to Miami in just seven days.

Plaintiffs pled guilty before the Honorable Ursula Ungaro, U.S. District Judge, Southern District of Florida, to knowingly providing materially false statements to a federal law enforcement officer during a boarding, while on board a vessel subject to the jurisdiction of the United States, 18 U.S.C. § 2237(a)(2)(B).  In making their pleas, each Plaintiff was represented by counsel, and each agreed to the facts as stated in the proffer:  they refused to stop their boat when hailed by the U.S. Coast Guard, and then lied to the Coast Guard officers about their intent to fish in the waters near the coast of Jamaica, when their true destination was Haiti.

Now after serving their sentences and being deported back to Jamaica, Plaintiffs bring this admiralty tort action against the United States, claiming their innocence and contradicting the factual proffer.  They challenge the Coast Guard's actions in stopping them on the high seas and detaining them during the pendency of Jamaica's diplomatic deliberation.  Plaintiffs invoke the Suits in Admiralty Act and the Public Vessels Act as the purported statutory waivers of the United States' sovereign immunity.  They allege violations of maritime tort law and "customary international law."

The United States moves the Court to dismiss this action because it falls squarely within the political question doctrine.  Under this doctrine, the case is nonjusticiable because the Constitution commits the decisions at issue to the political branches of government, particularly with respect to the conduct of foreign policy.  The Complaint's unmistakable center of gravity is the allegation that Plaintiffs spent too much time at sea.  Given the conclusive certification of the date Jamaica waived jurisdiction, it is not appropriate for the judiciary, via this maritime tort

lawsuit, to delve into matters of these States' diplomatic engagement.  Obviously, conditions at sea differ from land, with limited confines on Coast Guard vessels.  The necessities of adapting to the particular challenges aboard armed cutters at sea, holding suspects in close confines with the crew, while awaiting the results of diplomatic negotiations made pursuant to a treaty, are not justiciable matters for the Court.  The non-justiciable nature of this suit is further demonstrated by language in the U.S.-Jamaica Bilateral Agreement indicating that disputes are to be handled diplomatically between the sovereign States.  As a further sign that this is not a justiciable tort action, Plaintiffs go so far as to ask this Court to order the Coast Guard to implement alternative policies, practices, and procedures.  The United States respectfully requests that the action be dismissed in its entirety.

## BACKGROUND

### A.      International Framework

#### (1)      1988 Vienna Counter-Trafficking Convention

In 1990, the United States Senate ratified the United Nations Convention against Illicit Traffic in Narcotic Drugs and Psychotropic Substances (Vienna, 1988),  Dec. 20, 1988, 1582 U.N.T.S. 95, 28 I.L.M. 493, ("1988 Vienna Counter-Trafficking Convention"), *available at* https://treaties.un.org/Pages/CTCTreaties.aspx?id=6&subid=A&clang=_en.  This international treaty is one of the most widely signed in existence, with 191 states parties.[2]  All thirteen Independent Caribbean Island countries have either ratified or acceded to Convention.

This agreement among States was enacted "due to the magnitude of international criminal trafficking in narcotics and psychotropic drugs, the link between this illicit trafficking and related

---

[2] United Nations Treaty Collection; list of signatories and parties available at https://treaties.un.org/Pages/ViewDetails.aspx?src=TREATY&mtdsg_no=VI-19&chapter=6&clang=_en#14.

organized criminal activities, and the adverse effect of this on the foundations of society and the security of the party states."  Fern Kletter, 35 A.L.R. Fed. 3d Art. 6 (2018); *see* 1988 Vienna Counter-Trafficking Convention, 28 I.L.M. 493, 497 (recognizing that illicit trafficking "threaten[s] the stability, security and sovereignty of States").  The State parties reached this agreement "to improve international co-operation in the suppression of illicit traffic by sea," the eradication of which "*is a collective responsibility of all States* . . . ."  28 I.L.M. at 498 (emphasis added).  Absent such effort, the wealth of illicit trafficking "enabl[es] transnational criminal organizations to penetrate, contaminate and corrupt the structures of government . . . and society at all levels."  *Id.*  Parties to the U.N. treaty agree to adopt measures against drug trafficking and to provide a means for international cooperation in criminal prosecution.  The treaty specifically contemplates "investigations, prosecutions and judicial proceedings" in relation to criminal offences.  *Id.*, art. 7.

Article 17 of the 1988 Vienna Counter-Trafficking Convention addresses international cooperation to suppress illicit trafficking by sea.  The States agreed to a procedure by which one State may request authorization from another to board a vessel possessing its nationality, and then to search it, and "take appropriate action with respect to the vessel, persons and cargo on board."  *Id.*, art. 17.  "The [vessel's] flag State may, consistent with its obligations in paragraph 1 of this article, subject its authorization to conditions to be mutually agreed between it and the requesting Party, including conditions relating to responsibility."  *Id.*, art. 17, cl. 6.  Under the treaty, parties are to consider entering bilateral or regional agreements to carry out the provisions of Article 17.  *Id.*, art. 17, cl. 9.  As explained below, Jamaica and the United States did just this.

The 1988 Vienna Counter-Trafficking Convention is not self-executing, so it provides no private cause of action or individual rights.  *See generally* Restatement (Fourth) of Foreign

4

Relations Law § 310 (Am. Law Inst. 2018) (describing analysis to determine if a treaty provision is directly enforceable in U.S. courts).  It does, however provide a means for settling disputes among State Parties via diplomacy.  *Id.*, art. 32.

### (2)   United States/Jamaica Bilateral Agreement

The United States and Jamaica signed a Bilateral Agreement at Kingston, Jamaica, in 1997.[3]  The agreement was updated in 2004.  Agreement Between the Gov't of the United States of Am. & the Gov't of Jamaica Concerning Cooperation in Suppressing Illicit Mar. Drug Trafficking, Feb. 6, 2004, T.I.A.S. No. 98-310, ("Bilateral Agreement"), *available at* https://www.state.gov/98-310.  This agreement was entered "recalling further that [the 1988 Vienna Counter-Trafficking Convention] requires the Parties to consider entering into bilateral arrangements to carry out, or to enhance the effectiveness of, the provisions of Article 17."  *Id.* That is, it was entered as a concrete step in implementing the 1988 Vienna Counter-Trafficking Convention as between Jamaica and the United States.  The Bilateral Agreement was entered "on the basis of mutual respect for the sovereign equality and territorial integrity of States."  *Id.*

By its provisions, the two States give each other consent regarding specific shipboarding procedures.  This consent includes the reciprocal rights of either State to board and search a vessel claiming to be registered in the other State, with the flag State's approval.[4]  The agreement

---

[3]  Jamaican Ambassador Stephen Vasciannie described the negotiations between Jamaica and the United States as "particularly sharp," and said that at various points "negotiations appeared to approach breaking-point."  Stephen Vasciannie, *Political and Policy Aspects of the Jamaica/United States Shiprider Negotiations*, 43 Caribbean Quarterly 34, 34 (Sept. 1997). Vasciannie wrote: "success at the negotiating table was not assured in advance.  But, to their credit, the representatives of both sides were able eventually to disregard the rancour and posturing . . . ."  *Id.* at 46.

[4] The agreement is truly reciprocal, giving Jamaican law enforcement officers the ability to embark on U.S. law enforcement vessels to enforce the laws of Jamaica, and vice versa.  *Id.*, art. 7, 8.  The reciprocal right to ride on each other's ships has led to the Bilateral Agreement being called, colloquially, a "shiprider agreement."

provides procedures for requesting authorization to board and search suspect vessels.  *Id*., art. 14.

Where permission to board and search is granted and evidence is found of illicit traffic, the

boarding State will give the flag State the results of the search, including the names and claimed

nationality of persons on board.  The flag State will give "directions as to the disposition of the

vessel, cargo and persons on board."  *Id*., art. 3, ¶ 2.

As Plaintiff's own country and the United States agreed, "Pending receipt of such

instructions, the vessel, cargo *and persons on board may be detained*."  *Id*. (emphasis added).

The flag State, invested with the primary right to exercise jurisdiction over the vessel, its cargo,

and persons on board, may waive this right, and "authorize the other Party to enforce its laws

against the vessel, its cargo and persons on board."  *Id*., art. 3, ¶ 5.  The agreement provides no

private cause of action to the citizens of one State over and against the other sovereign State.  *Id*.;

*see also* Restatement (Fourth) of Foreign Relations Law, §§ 310, 311 (Am. Law Inst. 2018).  It

does, however, provide a means for settling disputes between States.  *Id*. art. 20.  Under Article

20, a State is to request consultation between the parties if it believes there is a "loss or injury"

for which it should be compensated.

### B.        Domestic Framework

Article 3 of the Vienna Convention mandates that each State Party shall adopt measures

to establish criminal offenses for illicit trafficking under its domestic law.  1988 Vienna Counter-

Trafficking Convention, art. 3, 28 I.L.M. 493, 500-03.  The United States has held to a

longstanding policy of condemning and criminalizing illicit trafficking, including trafficking at

sea, the history of which was explained in great detail by Judge Collyer in *United States v.*

*Carvajal*, 924 F. Supp. 2d 219, 230-33 (D.D.C. 2013).  In 1986, in anticipation of the 1988

Vienna Counter-Trafficking Convention, Congress enacted the Maritime Drug Law Enforcement

Act (MDLEA), 46 U.S.C. § 70501 *et seq.*  The MDLEA contains a provision for determining

when a vessel is "subject to the jurisdiction of the United States," 46 U.S.C. § 70502(c).

In 2006, Congress added to the criminal code an offense that criminalized the failure of a

"vessel subject to the jurisdiction of the United States" to knowingly fail to obey an order by an

authorized federal law enforcement officer to heave-to, to resist boarding, or to provide

materially false information to the law enforcement officer during a boarding regarding the

vessel's destination, origin, ownership, registration, nationality, cargo, or crew.  18 U.S.C.

§ 2237.  Section 2237 incorporates the MDLEA, 46 U.S.C. § 70502, for the definition of "vessel

subject to the jurisdiction of the United States," 18 U.S.C. § 2237(e)(3).

The MDLEA enables law enforcement to foil the illicit operations of "international drug

traffickers, who constantly refine their methods for transporting illegal narcotics from country to

country."  *Carvajal*, 924 F. Supp. 2d at 224.  Congress enacted the MDLEA "to facilitate

increased enforcement by the Coast Guard of laws relating to the importation of controlled

substances."  Maritime Drug Law Enforcement Act, Pub. L. No. 96-350, §§ 1–4, 94 Stat. 1159

(1986).  The MDLEA recognizes explicitly that "controlled substances aboard vessels is a

serious international problem, is universally condemned, and presents a specific threat to the

security and societal well-being of the United States."  46 U.S.C. § 70501.

The President has reaffirmed the international policy goal of thwarting transnational

criminal activity, including drug trafficking.  Exec. Order No. 13773, *Enforcing Federal Law*

*with Respect to Transnational Criminal Organizations and Preventing International Trafficking*,

82 Fed. Reg. 10691, 2017 WL 568296 (Feb. 9, 2017).  A significant component of this policy is

to "enhance cooperation with foreign counterparts . . . through increased security sector

assistance to foreign partners by the Attorney General and the Secretary of Homeland Security."

*Id.*, § 2(d).[5]

## FACTS

According to the Complaint, the Coast Guard intercepted the four Plaintiffs (plus a fifth

occupant of JOSSETTE, who has not brought suit) in international waters on September 14,

2017.  ECF 1, Compl. ¶ 2.  According to a Coast Guard witness statement, which Plaintiff Weir

filed in the criminal action, the Coast Guard spotted the go-fast vessel JOSSETTE traveling at a

high rate of speed in a known drug smuggling area, and chased it.  Ex. F at 5.  As the Coast

Guard closed the distance between the two vessels, they spotted bales of possible contraband in

JOSSETTE's wake.  *Id*. at 5.  The vessel continued to flee, ignoring the Coast Guard's siren,

blue lights, and call-outs on the loud hailer.  *Id*. at 6.  After finally stopping, the owner of the

vessel stated that they were fishing, but the Coast Guard saw little fishing gear, nowhere to store

any catch, and no ice onboard.  *Id*. at 7.  The bales tested positive for marijuana.  *Id*. at 7.

### A.     Jamaica's Waiver of Jurisdiction

The Secretary of State executed the Certification for the case involving JOSSETTE.  Ex.

A.  Commander Francis DelRosso, U.S. Coast Guard, served as the Coast Guard Liaison Officer

to the U.S. Department of State, Bureau of International Narcotics and Law Enforcement Affairs.

Ex. A. at 1.  Secretary of State Tillerson designated Commander DelRosso as the person

authorized to make formal certifications under 46 U.S.C. § 70502(c)(2) (consent or waiver of

objection by a foreign nation to the enforcement of U.S. law) and 18 U.S.C. § 2237(d).

---

[5]  *See also* White House Strategy to Combat Transnational Organized Crime, Addressing
Converging Threats to National Security (July 19, 2011), *available at*
https://obamawhitehouse.archives.gov/sites/default/files/Strategy_to_Combat_Transnational_Or
ganized_Crime_July_2011.pdf.

As the State Department designee, Commander DelRosso certified that the go-fast vessel JOSSETTE was stopped in international waters for suspected illicit drug trafficking. Ex. A at 1, ¶ 4(a). He certified that, on September 14, 2017, pursuant to Article 3 of the U.S.-Jamaica Bilateral Agreement, the United States asked the Government of Jamaica to confirm the registry or nationality of the suspect vessel, and if confirmed, to grant authorization to board and search the vessel. *Id*., ¶ 4(b). The Government of Jamaica confirmed the vessel's registration and authorized the United States to board and search. *Id*., ¶ 4(c). On September 18, 2017, again pursuant to Article 3 of the Bilateral Agreement, the United States requested that Jamaica waive jurisdiction over the vessel, its cargo, and crew to the extent necessary for the enforcement of United States law. *Id*., ¶ 4(d). "On October 9, 2017, the Government of Jamaica consented to the exercise of jurisdiction by the United States." *Id*., ¶ 4(e). The State Department thus determined that the vessel was subject to jurisdiction of the United States pursuant to 46 U.S.C. § 70502(c)(1)(C) and 18 U.S.C. § 2237(e)(3). *Id*., ¶ 4(f). The certification further stated that approximately 613 pounds of marijuana were recovered. *Id*., ¶ 4(g).

## B.      The Criminal Action, S.D. Florida

Following Jamaica's waiver of jurisdiction on October 9, 2017, the Coast Guard cutter on which Plaintiffs were then detained rendezvoused with another cutter which delivered them to Miami for prosecution. They arrived in Miami seven days after the waiver, on October 16, 2017. ECF 1 at 19–20.

In the criminal case, the five men each had separate criminal defense counsel. *United States v. Weir*, No. 17-cr-20877-UNGARO (S.D. Fla.). They appeared before Magistrate Judge Torres on October 17, 2017, the same day the criminal complaint was filed. Ex. B, S.D. Fla. No.

17-cr-20877, ECF 1.  The criminal docket states that the "date of arrest or surrender" was October 16, 2017.  S.D. Fla. No. 17-cr-20877, ECF 3-7.

The criminal complaint alleged a conspiracy to possess with the intent to distribute a controlled substance in violation of 46 U.S.C. §§ 70503(a)(1) and 70506(b), and included an affidavit of a special agent setting forth facts to establish probable cause to arrest the men.  Ex. B.  The agent stated that the Coast Guard recovered bales of marijuana in the surrounding waters that tested positive for marijuana and weighed 613 pounds.[6]  Ex. B, ¶ 8.

On December 13, 2017, Magistrate Judge White presided over the arraignment, during which Plaintiffs waived indictment and the United States filed an Information charging them with knowingly and intentionally providing materially false information to a federal law enforcement officer during a boarding of a vessel in violation of 18 U.S.C. § 2237(a)(2)(B).  Information, ECF 43, S.D. Fla. Case No. 17-cr-20877.

As part of the plea, each Plaintiff – then represented by counsel – signed a plea agreement and a factual proffer.  *Id.*, ECF 58-66; *e.g.*, Ex. C, Weir Plea Agreement; Ex. D, Weir Factual Proffer.  In the factual proffer, they agreed that, if the case had proceeded to trial, the United States would have proven beyond a reasonable doubt that on September 14, 2017, the Coast Guard cutter spotted the wake of their vessel speeding towards Haiti from Jamaica, and that "the vessel initially refused to stop."  Ex. D.  Only after the Coast Guard crew drew their weapons did JOSSETTE stop.  *Id.*  The vessel was in international waters.  *Id.*  One person claimed the vessel was Jamaican, so the Coast Guard contacted Jamaica.  *Id.*  "Jamaica

---

[6] The United States provided discovery to the defendants, including the statement of Coast Guard Officer Tyler Barkley, now deceased, which is discussed above.  Ex. F.  Plaintiff Weir later filed Barkley's statement in support of a motion asking the Bureau of Prisons to correct his date of apprehension at sea.  Ex. F, S.D. Fla. No. 17-cr-20877, ECF 90.

confirmed the registration of the vessel, but authorized the United States to board and search the

vessel.  Jamaica also later waived jurisdiction over the vessel.  Therefore, the vessel was subject

to the jurisdiction of the United States." *Id*. at 1.  Plaintiffs further agreed that their true

destination was Haiti, but that they had told the Coast Guard "that the vessel's destination was

the waters near the coast of Jamaica, where they intended to fish. *This was not true.*  As the crew

members, including the defendant, then and there well knew, the vessel's true destination was

Haiti." *Id*. at 2 (emphasis added).  Plaintiffs further agreed in the proffer that the falsehood was

"material" to the Coast Guard because the destination of a vessel is an important part of the

information gathered by the Coast Guard during a boarding, and can influence the United States'

decision-making process on what action to take during a boarding.  *Id*. at 2.

District Judge Ungaro held the change of plea hearing and sentencing on January 3, 2018.

Ex. E, Tr. of Plea Colloquy, ECF 93.  During the change of plea hearing, Judge Ungaro

questioned the four defendants who appeared, under oath (Defendant Patterson did not appear

because he had a doctor's appointment, *see* ECF 55).  Ex. E, Tr. at 3–4.  They stated that they

were satisfied with their counsel, and that they had read and understood the charge and their

cases.  *Id*. at 6–9.  They agreed that they were not threatened, coerced, or forced in any way to

enter a plea of guilty.  *Id*. at 12–13.  They told Judge Ungaro that they had a full opportunity to

review the factual proffer and discuss it with their lawyers before signing it.  *Id*. at 19.  They

stated that they agreed with "each and every fact" in the proffer.  *Id*. at 19–20.  The attorney for

the United States explained that the parties had been through "what I would call some of the best

lawyering I've seen," *id*. at 22, and he described how they agreed to the plea and a request for

immediate sentencing because the sentence was a "proper solution" given the challenges of the

criminal case, such as that hundreds of pounds of marijuana were found nearby, but not on

11

JOSSETTE. *Id*. at 22–23.  The agreement of all counsel was to recommend an upward departure from the sentencing guidelines in exchange for a charge that was less severe than the controlled substance charge.  The lawyers recommended a sentence of ten months for a charge where the guidelines were zero to six, as recognition that Plaintiffs faced the risk of being convicted of the drug charges, but the United States also faced the risk of not prevailing on the drug charges.  *Id*. at 23–25.  The Court agreed, and imposed sentence at that same hearing.  *Id*. at 24–35.

Plaintiffs thus pled guilty to providing false information to a federal law enforcement official during a boarding of a vessel in violation of 18 U.S.C. § 2237(a)(2)(B).  ECF 1, Compl. ¶¶ 17–20; Plea Agreement, S.D. Fla. # 17-cr-20877, ECF 58 (Weir), ECF 60 (Ferguson), ECF 62 (Williams), ECF 66 (Paterson).  In addition to this civil suit, Plaintiffs also recently filed motions to vacate their convictions as unconstitutional.  *See Ferguson v. United States*, No. 19-cv-22901 (S.D. Fla. filed July 12, 2019); *Weir v. United States*, No. 19-cv-23420 (S.D. Fla. filed August 15, 2019).

## ARGUMENT

The United States brings this motion to dismiss under Rule 12(b)(1).  *See Al-Tamimi v. Adelson*, 916 F.3d 1, 7 (D.C. Cir. 2019) (ruling that the political question doctrine is jurisdictional).  When evaluating a motion to dismiss for lack of subject-matter jurisdiction, the Court "treat[s] the complaint's factual allegations as true . . . and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'"  *Sparrow v. United Air Lines, Inc*., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (citations omitted).  Courts are not, however, "bound to accept as true a legal conclusion couched as a factual allegation . . . or to accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint."  *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 193 (D.C. Cir. 2006) (internal quotations omitted).  Because

Rule 12(b)(1) motions go to a court's jurisdiction, the Court "may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction." *Jerome Stevens Pharm., Inc. v. Food & Drug Admin.*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).  The plaintiff bears the burden of demonstrating subject-matter jurisdiction. *Rempfer v. Sharfstein*, 583 F.3d 860, 868 (D.C. Cir. 2009); *Fleming v. Cherokee Nation,* No. 19-cv-1397, 2019 WL 2327814, at *2 (D.D.C. May 31, 2019).

# I.     THIS CASE IS NONJUSTICIABLE UNDER THE POLITICAL QUESTION DOCTRINE

The political question doctrine follows from constitutional separation of powers.  It "excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. Am. Cetacean Soc.*, 478 U.S. 221, 230 (1986).  In *Baker v. Carr*, the Supreme Court provided a non-exhaustive list of situations in which a nonjusticiable political question exists, including when there is "a textually demonstrable constitutional commitment of the issue to a coordinate political department." *Baker v. Carr*, 369 U.S. 186, 217 (1962).[7]  *See also Zivotofsky v. Clinton*, 566 U.S. 189, 202–03 (2012).  Most, if not all, of the *Baker* characteristics are present in this lawsuit.  Indeed it presents a paradigmatic case:  courts may decline jurisdiction in the fields of "foreign policy and

---

[7] The *Baker v. Carr* list is as follows:  (1) a textually demonstrable constitutional commitment of the issue to a coordinate political department; (2) a lack of judicially discoverable and manageable standards for resolving it; (3) the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; (4) the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; (5) an unusual need for unquestioning adherence to a political decision already made; (6) the potentiality of embarrassment from multifarious pronouncements by various departments on one question.  *Baker v. Carr*, 369 U.S. 186, 217 (1962).

national security" because decision-making in those fields "is textually committed to the political branches of government." *Lin v. United States*, 561 F.3d 502, 505 (D.C. Cir. 2009) (quoting *Schneider v. Kissinger*, 412 F.3d 190, 194 (D.C. Cir. 2005)).

Courts follow a three-step process to determine whether the political question doctrine applies. First, the court identifies the issues raised by the plaintiff's complaint. Next, it analyzes the six *Baker* factors to determine whether any issue presents a political question. Finally, the court decides whether a plaintiff's claims can be resolved without considering any political question. *Al-Tamimi v. Adelson*, 916 F.3d 1, 8 (D.C. Cir. 2019).

### A.    The Challenged Acts

Plaintiffs' Complaint, although styled as a maritime tort, fundamentally seeks to have this Court question and ultimately reengineer the political branches' (and Jamaica's) construct for counter-trafficking efforts at sea. *See, e.g.*, ECF 1, ¶ 101. Plaintiffs seek declaratory and injunctive remedies, going so far as to ask the Court to order the Executive, through its agencies the State Department and Coast Guard, to "implement alternative policies, practices, or procedures." ECF 1, at 36. Plaintiffs challenge the process of enforcing the 1988 Vienna Counter-Trafficking Convention and the diplomatic negotiations between the United States and Jamaica about their detention. Plaintiffs further challenge conditions that are unique to detention at sea, apparently desiring that this Court direct Congress to appropriate, and the Coast Guard to construct and commission, cutters with interior cabins for use by detainees.

Plaintiffs' Complaint contains seven counts for various maritime torts (*e.g.*, false imprisonment, battery, or conversion of the fighting cock "Jah Roos"), three counts for alleged violations of customary international law (*e.g.*, forced disappearance, prolonged arbitrary detention), and one count seeking declaratory and injunctive relief. To determine any of these

counts, the Court would need to resolve whether the United States acted wrongfully, which in this context would mean questioning whether the United States contravened two applicable international agreements with respect to the conditions or length of detention, or else second-guessing whether the Executive should have awaited Jamaica's decision.[8]

Especially given that the United States detained the Plaintiffs at Jamaica's direction pending the Government of Jamaica's jurisdictional determination, which lasted for the first 25 of 32 days, all counts of the Complaint challenge foreign relations and/or diplomatic matters. Until Jamaica completed its decision-making process, the detainees remained under Jamaica's jurisdiction, detained pursuant to Article 17 of the 1988 Vienna Counter-Trafficking Convention and the Bilateral Agreement between the U.S. and Jamaica. Diplomatic options potentially available during the detention are not properly before the Court, such as whether Jamaica could have attempted through diplomacy to specify the conditions of the detention, or could have taken over the detention itself. Under the terms of the treaties, diplomatic solutions are available to settle disputes, including disputes about "any loss or injury" and "any improper or unreasonable action" taken by a party pursuant to the Bilateral Agreement. Bilateral Agreement, art. 20 ("Settlement of Disputes"), https://www.state.gov/98-310. The challenged acts thus implicate the diplomatic relations between the United States and Jamaica.

### B. The Challenged Acts Were Committed to the Political Branches.

Because the Constitution expressly commits the conduct of foreign affairs to the political branches, cases raising questions about the conduct of foreign affairs often present nonjusticiable political questions. *Al-Tamimi*, 916 F.3d at 10–11. The fields of foreign affairs and national

---

[8] Admiralty cases are tried to the Court, not a jury. Fed. R. Civ. P. 38(e); 46 U.S.C. § 30903(b).

security are "textually committed to the political branches of government." *Ali Jaber v. United States*, 155 F. Supp. 3d 70, 79 (D.D.C. 2016); *see also Bancoult v. McNamara*, 445 F.3d 427, 435 (D.C. Cir. 2006). As part of the Executive power vested in Article II of the Constitution, the President bears the "vast share of responsibility for the conduct of our foreign relations" and accordingly holds "independent authority 'in the areas of foreign policy and national security.'" *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414, 429 (2003).

This Circuit recently addressed foreign relations in *Al-Tamimi*. In that case, Palestinian nationals and Palestinian Americans sued the defendants, pro-Israeli American individuals and entities, alleging conspiracy to expel non-Jewish people from the West Bank and Gaza Strip. Invoking the Alien Tort Statute, they alleged civil conspiracy, genocide, and trespass. 916 F.3d at 4. The district court dismissed the case under the political question doctrine, among other reasons. The appellate court reversed in part, ruling that the plaintiffs' 200-page complaint boiled down to two questions: (1) who had sovereignty over the disputed territory, and (2) are Israeli settlers committing genocide. While the second question was extricable and was a justiciable legal issue under the Alien Tort Statute, the Court ruled that it lacked jurisdiction over the first question, because it "plainly implicates foreign policy and thus is reserved to the political branches." *Id*. at 11. To answer whether the conduct was constitutionally committed to the political branches, the court cited U.S. Constitution Article I, § 8 (Congress's power to "regulate Commerce with foreign Nations"), and Article II, § 2 (the President's power to "make Treaties" and "appoint Ambassadors"). *Id*. at 10. Those sections of the Constitution apply here, as well. In addition, in the present case, the Constitution further vests in Congress the power to "define and punish Piracies and Felonies committed on the high Seas, and Offenses against the Law of Nations." U.S. Const. art. I, § 8.

The D.C. Circuit discussed the political nature of foreign relations in *El-Shifa Pharm. Indus., Co. v. United States*, 607 F.3d 836, 841 (D.C. Cir. 2010).  In that case, the owners of a Sudanese pharmaceutical plant sued the United States for unjustifiably destroying the plant, failing to compensate them for its destruction, and defaming them.  The district court dismissed the complaint under the political question doctrine, among other reasons.  *El-Shifa Pharm. Indus. Co. v. United States*, 402 F. Supp. 2d 267 (D.D.C. 2005).  The district court was not convinced by the tort language of the complaint:  "[a]lthough plaintiffs have characterized their claims using traditional tort vocabulary, 'their allegations implicate broader political questions that encompass U.S. foreign policy and military operations.'"  *Id*. at 276, quoting *Industria Panificadora, S.A. v. United States*, 763 F. Supp. 1154, 1161 (D.D.C. 1991).  On appeal, the plaintiffs abandoned their demand for monetary relief, but sought a declaration that the United States had violated international law, a declaration that the United States had defamed them, and an injunction requiring the United States to retract its statements about the plaintiffs.  607 F.3d at 840.  A panel affirmed the district court, holding that the claims were barred by the political question doctrine.  *El-Shifa Pharm. Indus., Co. v. United States*, 559 F.3d 578 (D.C. Cir. 2009).  On rehearing *en banc*, the appellate court again affirmed the dismissal on political question grounds.  607 F.3d at 851.  The court cited the rule that "courts cannot reconsider the wisdom of discretionary foreign policy decisions."  *Id*. at 844.  The court declined "to mimic the constitutional role of the political branches" by guessing how they would have conducted foreign policy had they been better informed about the nature of the plaintiffs' plant.  *Id*. at 845.  Similarly, in the present case, the allegations of the Complaint would require the Court to decide whether it would have conducted diplomatic relations with a foreign sovereign in a different way, or whether it would have read the two treaties to require the U.S. Coast Guard to detain the

Plaintiffs in different conditions, such as on a hypothetical cutter constructed with dedicated interior brig space for detainees, which does not exist.  As in *El-Shifa*, the tort language in the Complaint does not remove this case from the realm of the political questions that encompass foreign relations.

The Court may also find guidance in *Schneider v. Kissinger*, 310 F. Supp. 2d 251 (D.D.C. 2004), *aff'd*, 412 F.3d 190 (D.C. Cir. 2005).  In *Schneider*, the children of a Chilean Army General sued the United States, seeking to hold the United States liable for its involvement in supporting the attempted kidnapping of their father, which resulted in his death.  310 F. Supp. 2d at 254–57.  The district court dismissed the action under the political question doctrine, and the appellate court affirmed.  The appellate court first ruled that the fields of foreign policy and national security are textually committed to the political branches of the government.  412 F.3d at 194.  The Constitution, it noted, gives the Judiciary "no authority for policymaking in the realm of foreign relations or provision of national security."  *Id*. at 195.  The court further found a lack of judicially discoverable and manageable standards for resolving the Executive Branch's involvement in supporting covert actions in Chile.  *Id*. at 196.  The appellate court agreed with the district court that "[r]esolving the present lawsuit would compel the court, at a minimum, to determine whether actions or omissions by an Executive Branch officer in the area of foreign relations and national security were 'wrongful' under tort law."  *Id*.  Following the 11th Circuit's decision in *Aktepe v. United States*, 105 F.3d 1400, 1404 (11th Cir. 1997), the court declined to recast foreign policy and national security questions in tort terms.  *Id*. at 197; *accord Harbury v. Hayden*, 522 F.3d 413, 419–20 (D.C. Cir. 2008) (affirming dismissal of foreign-relations case under political question doctrine, and discussing *Schneider* and other applicable precedent).

Plaintiffs explicitly ask the Court to "Order the Coast Guard to implement alternative policies," ECF 1 at 36, thus seeking to interject the judiciary into the United States' foreign relations and national security policy decision-making.  Plaintiffs may argue that their case does not involve national security, but it is the stated position of the Executive Branch that illegal drug smuggling presents a threat to "public safety" and "national security."  Exec. Order No. 13773, *Enforcing Fed. Law with Respect to Transnat'l Criminal Orgs. and Preventing Int'l Trafficking*, 82 Fed. Reg. 10691, 2017 WL 568296 (Feb. 9, 2017).  Congress has also found that illicit maritime trafficking "is a serious international problem, is universally condemned, and presents a specific threat to the security and societal well-being of the United States." 46 U.S.C. § 70501.

They key fact in this case is that Plaintiffs were detained for the first 25 days while the Government of Jamaica undertook the significant decision about whether to waive jurisdiction over the prosecution of its citizens.  Under United States law, this waiver of jurisdiction "is proved conclusively by certification of the Secretary of State or the Secretary's designee."  46 U.S.C. § 70502(c)(2)(B); *see also* 18 U.S.C. § 2237(d) (applying § 70502's definition of "vessel subject to the jurisdiction of the United States").  "Congress effectively foreclosed a defendant's ability to challenge the factual underpinnings of a State Department certification when it amended the MDLEA to provide explicitly that such a certification conclusively proves a foreign nation's consent, waiver, or objection regarding a vessel's national registry." *United States v. Gil-Martinez*, 980 F. Supp. 2d 165, 169 (D.P.R. 2013) (citing *United States v. Cardales–Luna*, 632 F.3d 731, 737 (1st Cir. 2011)).  "[A]ny further question about [the certification's] legitimacy is 'a question of international law that can be raised only by the foreign nation.'" *Gil-Martinez*, 980 F. Supp. at 169 (quoting *United States v. Bustos–Useche*, 273 F.3d 622, 627 & n.5 (5th Cir. 2001)).  The Certification states that the United States alerted the Government of Jamaica

19

immediately upon stopping the go-fast vessel, that Jamaica authorized the boarding and search that day, and later waived its jurisdiction to prosecute.  Ex. A, ¶ 4.  This Certification conclusively establishes the timeline for the detention, as well as the diplomatic coordination of U.S. Executive agencies with the Government of Jamaica.

Plaintiffs complain about the conditions of detention, which even if accepting them as true, is also a matter of foreign affairs and national security committed to the political branches. Neither the Convention nor the Bilateral Agreement mandates specific details about the conditions of detention at sea.  The limitations of life at sea are reflected in the Convention, however.  Article 17 of the 1988 Vienna Counter-Trafficking Convention states that boarding, searching, and action with respect to persons on board "shall be carried out only by warships" or other ships "clearly marked and identifiable as being on government service and authorized to that effect."  1988 Vienna Counter-Trafficking Convention, art. 17, cl. 10.  The treaty states that parties taking such action "shall take due account of the need not to endanger the safety of life at sea."  *Id.*, art. 17, cl. 5.  The conditions of detention on a warship at sea are, of course, constrained by the architecture of the vessel itself, the need to ensure safety and security of the crew, and other factors such as the vessel's other missions and assignments.

The Bilateral Agreement with Jamaica has been in effect for over twenty years, during which time the two nations have worked together in support of the 1988 Convention, and during which time diplomatic channels have been open to discuss this cooperation and partnership. Article 7 of the Bilateral Agreement permits Jamaican law enforcement officials to embark on United States law enforcement vessels, at which point all activities, including "detentions" shall be "the responsibility of the Jamaican law enforcement officials and carried out by them." Bilateral Agreement, art. 7, ¶ 2.  This provides another way for Jamaica to know about and

participate in decisions about the conditions of detention at sea.[9]

To the extent Plaintiffs argue that the United States should have brought the detainees to a U.S. shore during the Jamaican government's multi-week period of diplomatic deliberation, such inquiry by the Court would be an improper infringement into matters constitutionally committed to the political powers, especially as bringing the four Jamaicans into U.S. territory without the permission of Jamaica could have been a diplomatic offense to Jamaica.  Plaintiffs' Complaint might be suggesting that the Coast Guard should have returned them to Jamaica after some unspecified period, but absent a request from Jamaica for return, that could have resulted in further diplomatic issues, and been perceived as a violation of the 1988 Vienna Counter-Trafficking Convention or the Bilateral Agreement with Jamaica.  More fundamentally, no "return" to Jamaica could be possible without entrance by a U.S. public vessel into Jamaican territory and without arranging for intergovernmental transfer of custody, both of which require diplomatic processes.  The decision about what to do with persons detained on the high seas in accordance with these international agreements is exclusively one of foreign affairs.

### C.    Actions Taken Pursuant to 1988 Vienna Counter-Trafficking Convention and Bilateral Agreement with Jamaica Are Not Subject to Judicial Review.

The international law context of this case makes it particularly non-justiciable.  The treaties at issue, the 1988 Vienna Counter-Trafficking Convention and the Bilateral Agreement

---

[9] In accordance with Article 9 of the 1988 Vienna Counter-Trafficking Convention ("Other Forms of Cooperation and Training"), the United States and Jamaica engage in joint training. *E.g.*, *Tradewinds 2014: A Joint Training Effort*, Coast Guard Compass (June 17, 2014), *available at* https://coastguard.dodlive.mil/2014/06/tradewinds-2014-a-joint-training-effort/. Top officials from Jamaica and the United States participated in the joint training in 2016. *Exercise Tradewinds 2016 Phase II Wraps Up*, U.S. Southern Command (June 29, 2016), *available at* https://www.southcom.mil/MEDIA/NEWS-ARTICLES/Article/1041667/exercise-tradewinds-2016-phase-ii-wraps-up/.  Videos and articles about the June 2017 training are available at: https://www.dvidshub.net/feature/Tradewinds2017.

with Jamaica, are not self-executing, and thus accord no rights to an aggrieved individual.  As explained in the Restatement, a treaty provision is directly enforceable in courts of the United States only if it is self-executing.  Restatement (Fourth) of Foreign Relations Law § 310 (Am. Law Inst. 2018).  Courts will evaluate the text and context of the treaty to determine whether the U.S. treaty-makers understood the provision at issue to be directly enforceable in courts in the United States.  *Id*.

Neither the 1988 Vienna Counter-Trafficking Convention nor the Bilateral Agreement provide a private cause of action.  Both do, however, provide a process for disputes to be resolved State-to-State.  1988 Vienna Counter-Trafficking Convention, art. 32; Bilateral Agreement, art. 20.  No international or domestic law permits Plaintiffs to bring these allegations in a private tort lawsuit.  In a similar case in the Southern District of New York, the court ruled that the Public Vessels Act and the Suits in Admiralty Act did not afford a private vessel a right to sue for property damages following what it alleged was a violation of international law and/or treaties.  The court explained, "[n]or, of course, should the Court incorporate a rule of international law into domestic law—here, the PVA and the SIAA—when the political branches have not seen fit to do so themselves."  *Tarros S.p.A. v. United States*, 982 F. Supp. 2d 325, 343 (S.D.N.Y. 2013) (citing *Sosa v. Alvarez-Machain*, 542 U.S. 692, 735–36 (2004)).

Through the underlying criminal statute, Congress sought to minimize any impingement upon foreign relations.  The MDLEA was amended in 2006 to provide that the State Department's certification "conclusively" proves the response of the foreign nation.  46 U.S.C. § 70502(c)(2)(B); *see also* 18 U.S.C. § 2237(d); *United States v. Hernandez*, 864 F.3d 1292, 1300–01 (11th Cir. 2017); *United States v. Brant-Epigmelio*, 2010 WL 557283, at *5 n.6 (M.D. Fla. 2010) (describing the amendments that made the certification conclusive).  In a criminal

action where the United States obtains the consent of a foreign State to exercise jurisdiction over its flag vessel or citizens, the criminal defendants cannot delve into the diplomatic communications to attempt to find a flaw in the jurisdictional waiver.  Congress further removed a criminal defendant's ability to use the "failure to comply with international law" as a defense. 46 U.S.C. § 70505.  "A claim of failure to comply with international law in the enforcement of this chapter *may be made only by a foreign nation*."  46 U.S.C. § 70505 (emphasis added). "With that text [§ 70505], Congress has instructed:  any battle over the United States' compliance with international law in obtaining MDLEA jurisdiction should be resolved nation-to-nation in the international arena, not between criminal defendants and the United States in the U.S. criminal justice system."  *Hernandez*, 864 F.3d at 1302; *see also United States v. Miranda*, 780 F.3d 1185, 1194–95 (D.C. Cir. 2015).  The conclusive nature of the State Department's certification would be subverted if it could be challenged by an individual defendant in a later tort lawsuit.

In other words, it is not for the Court to decide how the nation-to-nation communications and decision-making should have happened in this case.  Here, the United States notes the significance of Plaintiffs' allegation that "[a]bsent declaratory and injunctive relief, Plaintiffs will suffer irreparable injury.  *They have no adequate remedy at law*."  ECF 1, ¶ 157 (emphasis added).  Accepting *ex arguendo* these foreign nationals' allegations of violations of international law, their remedy would be pursued properly through the Government of Jamaica, which in turn could address any grievance against the United States through prescribed mechanisms of international diplomacy and law.  They ask the Court to answer a nonjusticiable political question by alleging that they have no adequate remedy absent declaratory and injunctive relief against the United States.  This conclusion necessarily requires the Court to ask whether they

23

have a remedy available through their own government's ability to obtain relief diplomatically, which question is inherently nonjusticiable.

One of Plaintiffs' complaints is that the United States did not contact their families or let them contact their families.  Plaintiffs were not held in "secret" as alleged—through the State Department Certification, the Court can see that the United States informed the Jamaican Government of JOSSETTE and crew on September 14, 2017, when the Coast Guard detected the vessel and asked for Jamaica's permission to board and search, and again on September 18, 2017, when the United States made a formal request for waiver of jurisdiction to the extent necessary for the enforcement of United States law.  Ex. A; *see also* Bilateral Agreement art. 3. Should this lawsuit require inquiry into why Plaintiffs' families claim they were not alerted to the detention, discovery would require questions about the practices of the foreign sovereign itself.  Not only is the United States the wrong party for such allegation, but the political question doctrine prevents this type of intrusive inquiry against the sovereignty of a foreign nation.

### D.      The Court Lacks Judicially Discoverable and Manageable Standards for Resolving the Conflict.

This case exhibits a lack of judicially discoverable and manageable standards for resolving it.  *Baker*, 369 U.S. at 217.  The United States has already discussed above the problem of the Court needing to analyze the diplomatic communication with a foreign sovereign.  Further, should this case proceed, the Court would need to find judicially manageable standards for analyzing the decisions of the Coast Guard about how to detain counter-trafficking suspects aboard a warship on the high seas, or even how the Coast Guard seeks appropriations from the Congress for larger cutters or cutters with interior brig space for detainees.

The Court may draw guidance from a number of cases involving questions of U.S. military vessels operating at sea, which questions are similarly political in nature.  For example,

the Fourth Circuit found that the political question doctrine applied to a case where the U.S. Navy unintentionally killed a hostage during an engagement with Somali pirates.  *Wu Tien Li-Shou v. United States*, 777 F.3d 175, 181 (4th Cir. 2015), *cert. denied* 136 S. Ct. 139 (2015). The hostage's family sued the United States under the Suits in Admiralty Act, Public Vessels Act, and the Death on the High Seas Act.  The court ruled that, "[a]s judges, we are just not equipped to second-guess such small-bore tactical decisions. . . .  We do not know the waters. We do not know the respective capabilities of individual pirate ships or naval frigates. We do not know the functionality and limitations of the counter-piracy task force's assets."  *Id*.  With respect to the Navy's intentional sinking of the hostage's boat as a hazard to navigation, which was also a part of the complaint, the court ruled that it lacked judicially manageable standards to judge the decision:  "We do not know how a decision to tow and not to sink the JCT 68 would have affected the task force's mission by tying down valuable naval resources."  *Id*.  The court continued, "[w]hat we do know is that we are not naval commanders.  These are questions not intended to be answered through the vehicle of a tort suit."  *Id*.  The court concluded that the complaint, in effect, asked the judiciary to act as the commander:  "This request . . . encourages the courts to bull their way into the chain of command of a multinational operation.  In fact, Wu would have us sit astride the top of the command pyramid and decree the proper counter-piracy strategies and tactics to the NATO and American commanders below."  *Id*.  Replacing "counter-piracy" with "counter-trafficking," and "Navy" with "Coast Guard," the Fourth Circuit's analysis could have been written of the *Weir* Complaint.

The Eleventh Circuit also found a lack of judicially discoverable and manageable standards when asked to resolve the lawsuit brought by approximately 300 Turkish Navy sailors after a United States warship inadvertently fired a live missile into the Turkish warship, which

25

was acting under the command of a Netherlands Admiral pursuant to NATO directions. *Aktepe v. United States*, 105 F.3d 1400 (11th Cir. 1997). The plaintiffs sued the United States under the Public Vessels Act and the Death on the High Seas Act. *Id*. at 1402. After analyzing the foreign-relations and military aspects of the tragic incident, the court further found that it lacked judicially discoverable and manageable standards to judge how the U.S. Navy conducted the missile firing drill on USS SARATOGA. "[C]ourts lack standards with which to assess whether reasonable care was taken to achieve military objectives while minimizing injury and loss of life." *Id*. at 1404.

The same result was reached in the *Tarros* case, which also was brought under the Public Vessels Act and the Suits in Admiralty Act. The district court found it lacked judicially manageable and discoverable standards to resolve the case where a U.S. warship, in accordance with a U.N.-approved embargo to prevent arms trafficking, diverted an Italian cargo ship from calling in Tripoli, Libya. The plaintiff allegedly suffered injury to the vessel's electronics, and business losses from not being able to discharge or load cargo. *Tarros S.p.A. v. United States*, 982 F. Supp. 2d 325 (S.D.N.Y. 2013). "While Plaintiff suggests that the common law of tort provides the relevant standard, it does not propose a specific standard to govern the conduct of a naval warship subject to military control in enforcing an international arms embargo . . . ."[10] *Id*. at 336.

The Southern District of New York reached the same conclusion in a case where the CIA allegedly mined a Nicaraguan harbor, causing damage to the plaintiffs' cargo ship. *Chaser*

---

[10] The *Tarros* court distinguished the case of *Koohi v. United States*, 976 F.2d 1328 (9th Cir. 1992). In *Koohi*, the Ninth Circuit found justiciable a tort case against the United States arising from a U.S. warship's accidental shooting of an Iranian civilian aircraft during the Iran-Iraq War. *Tarros*, 982 F. Supp. 2d 325, 337. The court found that the Ninth Circuit's interpretation of case law was not persuasive and constituted a "departure from existing case law." *Id*.

*Shipping Corp. v. United States*, 649 F. Supp. 736, 737 (S.D.N.Y. 1986), *aff'd*, 819 F.2d 1129

(2d Cir. 1987).  In that case, brought under the Suits in Admiralty Act and the Federal Tort

Claims Act, the court found a "clear lack" of judicially manageable standards.  *Id*. at 738.  "The

Court simply does not agree with plaintiffs that an inquiry into the issues of tort liability raised

by their complaint would be a manageable one."  *Id*.  "The complaint reveals that this is an

action by two foreign entities seeking damages for injuries suffered in foreign waters due to

covert mining operations conducted there by the Executive Branch."  *Id*.  "[T]he Court would be

incapable of assessing the underlying military and diplomatic considerations which resulted in

the decision to place the mines without warning to innocent third party vessels."  *Id*. at 739.

There is no clear-cut standard of care, as if in a tort context, for the decisions made by

Executive Branch agencies while conducting diplomatic communications with a foreign State

about the means of interdicting, identifying, or detaining drug-trafficking suspects on the high

seas, or the conditions of detaining them aboard an armed cutter at sea.  No tort standard of care

can provide guidance for how long the United States should wait for a foreign State to make a

jurisdictional determination, given the sensitive foreign policy relations involved.  Similarly, no

tort standard of care provides guidance on the exigencies of the conditions of being detained

aboard a cutter at sea.  This is especially so given the Commanding Officer's need to keep the

crew, guards, and detainees safe, balancing against the cutter's other missions.  Diplomatic

concerns imbue the conditions of the detention, as well, removing it from the ordinary

application of a tort standard of care, because during the 20 years these treaties have been in

effect, the United States and Jamaica, acting as partners in operation and in training, have had

ample opportunity to become aware of such conditions on each other's vessels.  The lack of

judicially manageable and discoverable standards places this case squarely within the political question doctrine.

### E.      Prudential Factors Apply Here.

The final four *Baker* factors have been called the "prudential factors." *Al-Tamimi*, 916 F.3d at 12. These factors include the respect due coordinate branches of government and potential of embarrassment from multifarious pronouncements by various departments on one question. The D.C. Circuit has ruled that, in analyzing the prudential factors, "the official position of the Executive is highly relevant." *Id*. at 13.

Prudential factors counsel against judicial pronouncements on the United States' diplomacy with Jamaica, on any actions taken by Jamaica, and on the United States' detention of Plaintiffs at Jamaica's direction during its period of deliberation on the request to waive jurisdiction. The official Department of State Certificate is, by statute, "conclusive" proof of the foreign nation's consent. Certificate, Ex. A; *see* 46 U.S.C. § 70502(c)(2)(B). Given that criminal defendants cannot look beyond the State Department Certification to challenge the jurisdiction of the prosecution, *see Hernandez*, 864 F.3d at 1299–1301, a judicial finding in a civil tort case that delves into the details of the diplomatic communications, procedures, and timeline would implicitly reopen the door that Congress closed in the MDLEA.

Respect for the sovereign rights of Jamaica lends further support for prudential hesitancy to conflict with the pronouncements of the other branches. The role of the United States was to communicate the identities of the detainees to the Government of Jamaica, at which point Jamaica exercised its rights as a sovereign, including any communication with the detainees' families, any requests for particular treatment of the detainees (knowing they were being held at sea during hurricane season), and the decision about whether to waive jurisdiction for the

criminal prosecution.  Any pronouncements on these subjects could be problematic to ongoing foreign relations matters.

F.     **Plaintiffs' Tort Allegations Are Not Extricable and Do Not Make this Case Justiciable.**

The purported maritime tort analysis of this case is inseparable from the nonjusticiable analysis of the Coast Guard's actions in support of international coalitions and the Bilateral Agreement with Jamaica.  The fact that Plaintiffs label several of their Counts as "intentional" torts supports the nonjusticiability of this action, as Plaintiffs challenge the authority and execution of intentional detention actions.

While the court is the proper place to bring an "ordinary tort lawsuit," *Klinghoffer v. S.N.C. Achille Lauro*, 937 F.2d 44, 49 (2d Cir. 1991), the present case is not an ordinary tort lawsuit, given the circumstances of the detention on the high seas and the key involvement of a foreign State.  The cases discussed above, such as *Wu*, *Aktepe*, *Tarros*, and *Chaser*, demonstrate that the vehicle of maritime tort law cannot be used to bring an otherwise nonjusticiable action.  Although the allegations in some of those cited cases were particularly tragic, such as the inadvertent killings in *Aktepe* and *Wu*, none of those courts saw fit to extricate portions of those cases from the political question analysis.[11]  Likewise, this action presents no extricable questions for the Court to resolve.

## II.     OTHER GROUNDS FOR DISMISSAL

Other grounds exist for dismissing all or part of this action.  Given the importance and threshold nature of the political question doctrine, the United States will not brief the other

---

[11] This includes the deliberate sinking of the plaintiff's vessel in *Wu*.  "We do not know how a decision to tow and not to sink the JCT 68 would have affected the task force's mission by tying down valuable naval resources."  *Wu*, 777 F.3d at 181.

grounds here, but will seek leave to file an additional memorandum of law supporting dismissal should the Court decline to apply the political question doctrine.

Briefly, the Public Vessels Act requires a plaintiff to plead reciprocity, *i.e.*, that a citizen of the United States could bring a reciprocal lawsuit for the same allegations in the foreign country against that sovereign.  Plaintiffs fail to allege in their Complaint that a similarly situated United States citizen could bring a lawsuit, in Jamaica, against the Jamaican government, seeking the relief sought for the acts alleged here, including Plaintiffs' demands to order the government to implement alternative policies, practices, and procedures.  46 U.S.C. § 31111.  Therefore, the Complaint is deficient.

Should the present motion be denied, the United States also would seek leave to brief the application of the discretionary function exception to the United States' waiver of sovereign immunity.  The discretionary function exception shields the United States from tort lawsuits challenging discretionary, policy-based actions of federal agencies and their employees.  *United States v. Gaubert*, 499 U.S. 315 (1991).[12]  The purpose of the exception is to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort."  *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 814 (1984).  The Complaint, on its face, challenges discretionary acts and Coast Guard policies, asking the Court to "order the Coast Guard to implement alternative policies."  ECF 1 at 36.  Plaintiffs explicitly allege that "the injuries they have suffered were pursuant to Defendants' policy and practice."  ECF 1 at 4, ¶ 12.

---

[12] In a case challenging counter-trafficking actions taken by the U.S. Coast Guard against an Ecuadorian vessel in 2007, the Ninth Circuit held that the discretionary function exception barred the maritime tort claim (with the limited exception of whether the United Stated owed compensation to the vessel's owner for damage to the vessel under the terms of Ecuador's *ad hoc* authorization to board and search).  *Tobar v. United States*, 731 F.3d 938, 946 (9th Cir. 2013).

This case falls squarely within *Shuler v. United States*, 531 F.3d 930, 936 (D.C. Cir. 2008), where the court ruled that the government's failure to protect an informant was a discretionary, policy-based decision that fell within the discretionary function exception. Accordingly, and if necessary, the United States will address this issue in further detail.

Finally, should the Court need to reach the issue, the naming of Admiral Schultz as an individual defendant is improper, and he should be dismissed from this action. Under the Suits in Admiralty Act and the Public Vessels Act, the United States is the only proper defendant. 46 U.S.C. § 30903 (SIAA waiving sovereign immunity for suits "against the United States"); 46 U.S.C. § 31102 (PVA waiving sovereign immunity for suits "against the United States"). Neither the general grant of admiralty jurisdiction in 28 U.S.C. § 1333 nor the Declaratory Judgment Act, 28 U.S.C. § 2201, provide a waiver of sovereign immunity, so neither can be the basis for a suit against the United States or Admiral Schultz, standing alone. *Benvenuti v. Dep't of Def.*, 587 F. Supp. 348, 352 (D.D.C. 1984).

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that this case be dismissed. Fed. R. Civ. P. 12(b)(1).

DATED: September 26, 2019

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

JESSIE K. LIU (D.C. Bar 472845)
United States Attorney

By: /s/ *Jill Rosa*
DOUGLAS M. HOTTLE
JILL DAHLMANN ROSA (D.C. Bar 451578),
Senior Trial Counsel
THOMAS M. BROWN

31

JUSTIN R. JOLLEY
Trial Attorneys
U.S. Department of Justice
Civil Division, Torts Branch
Aviation, Space & Admiralty Litigation
P.O. Box 14271
Washington, DC 20044
(202) 616-2973, Douglas.Hottle@usdoj.gov
(847) 732-1141, Jill.Rosa@usdoj.gov
(202) 616-4112, Thomas.M.Brown@usdoj.gov
(202) 616-4035, Justin.R.Jolley@usdoj.gov
Fax:  (202) 616-4002
Attorneys for the United States