UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| ROBERT DEXTER WEIR et al., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES OF AMERICA, et al., <br><br> Defendants. | Civil Action No. 19-1708 (TFH) |

**REPLY IN SUPPORT OF
THE UNITED STATES' MOTION TO DISMISS**

The United States hereby replies to Plaintiffs' opposition to its motion to dismiss.

**(1)     Plaintiffs' Allegations Implicate the *Baker v. Carr* Factors.**

This case implicates the most important factor set forth in *Baker v. Carr*, factor # 1, by asking the Court to answer questions that impinge upon the constitutional commitment of foreign relations to the Executive and Legislative Branches. *Baker v. Carr*, 369 U.S. 186, 217 (1962). The United States' conduct was not unilateral. Rather, once JOSSETTE's crew claimed Jamaican nationality, and Jamaica confirmed it, the situation was governed by the U.S.-Jamaica Bilateral Agreement. *Agreement Between the Gov't of the United States of Am. & the Gov't of Jamaica Concerning Cooperation in Suppressing Illicit Mar. Drug Trafficking*, Feb. 6, 2004, T.I.A.S. No. 98-310, ("Bilateral Agreement"), *available at* https://www.state.gov/98-310.

The agreement with Jamaica was a negotiated agreement, tailored specifically to address the concerns of both nations and to respect each other's sovereignty. *See* ECF 12-1, U.S. Mem. at 5, n.3. By the terms of that agreement, Plaintiffs remained under Jamaica's jurisdiction until

1

the government of Jamaica completed its deliberative process and chose to waive jurisdiction. Bilateral Agreement, art. 3.

Plaintiffs say they "challenge *only* U.S. conduct on U.S.-flagged vessels based on U.S. and maritime law," arguing that the Complaint does not implicate foreign relations. Opp'n at 17 (emphasis in original). This ignores entirely the treaties that governed the State actors' conduct and the diplomacy that arose concerning JOSSETTE and crew from September 14, 2017, until Jamaica waived jurisdiction on October 9, 2017.[1]

Despite Plaintiffs' desire to extricate select portions of their case to salvage them from this motion (Opp'n at 32), the entirety of the Complaint falls within the political question doctrine. The length of the detention and the conditions of the detention were matters of foreign affairs. The United States immediately reported the Plaintiffs' identities to the Jamaican government. Jamaica knew these Plaintiffs, its nationals, were being held at sea during the period of deliberation.

As seen in the 1988 Vienna Counter-Trafficking Convention and the Jamaica-U.S. Bilateral Agreement, diplomatic solutions exist for the challenges of implementing counter-trafficking agreements. *E.g.*, Bilateral Agreement, art. 20. The United States and Jamaica have spent 20 years implementing the Convention and the Bilateral Agreement. These 20 years of cooperation have included joint training on interdiction and detention processes, as well as reciprocal shipriding, where each State Party's law enforcement officers may embark on the other's vessels. Bilateral Agreement, art. 7-9. The United States and Jamaica have amended the Bilateral Agreement once since 1997, highlighting that negotiated amendments are a diplomatic

---

[1] Plaintiffs also make "customary international law" allegations, ECF 1 at 32-34, further belying their argument that the Complaint is "*only* . . . based on U.S. and maritime law."

option for either party seeking to change terms, to provide alternative remedies for those allegedly aggrieved, or to require changes to the conditions of detention.

All of Plaintiffs' allegations implicate, and pray the Court to enmesh itself into, the type of foreign-relations decisions that are constitutionally committed to the Legislature and the Executive. For example, Plaintiffs continue their allegation that their families were unaware of their detention at sea. Opp'n at 26, n.5. But the United States – hardly keeping secrets – began communicating with Jamaica immediately upon Plaintiffs' claiming Jamaican nationality. It was up to the flag state to determine whether to respond to inquiries from, or to affirmatively contact, the detainees' families. One can speculate why a foreign government might not want to spread information about the location of illicit trafficking suspects, but Jamaica's reasoning is not before the Court. How the flag state should have further communicated, or whether the United States should have bypassed the government of Jamaica and communicated directly with foreign nationals within Jamaican sovereign territory, would be political questions.

This case also exhibits a lack of judicially discoverable and manageable standards for resolving it. *Baker*, 369 U.S. at 217. Attempting to ignore the treaties and the lengthy diplomatic engagement with Jamaica, Plaintiffs cite cases that did not include such complicating diplomatic facts, to argue that this Court has standards to adjudicate maritime torts. Opp'n at 27. Plaintiffs make the United States' point here – indeed traditional maritime torts are regularly litigated in federal courts under the grant of admiralty jurisdiction, but this is not such a claim. Plaintiffs' novel case asks the Court to answer questions about how and for how long detainees are to be held at sea aboard U.S. cutters while they are under Jamaican jurisdiction pursuant to a bilateral agreement. None of the cases cited by Plaintiffs involved treaties, diplomacy, or the detention of foreign nationals at sea pursuant to an international agreement like this one.

Plaintiffs also ignore the difficulty of asking the judiciary to weigh in on the national security aspects of this case. Life aboard a cutter means limited space and facilities, and the Coast Guard must make decisions about how to maintain security with detainees aboard an armed vessel while conducting ongoing Coast Guard missions at sea. This especially means deciding who has access to the interior, where hazardous equipment and classified materials can be found; not to mention where the crew live and sleep. Plaintiffs complain about the sanitation system on some of the cutters, but access to interior marine sanitation devices would mean escorting and watching a detainee as he or she accessed the interior facilities, requiring additional watchstanders, and other security complications. Similarly, allowing drug trafficking suspects access to the cutter's satellite phone in the classified Combat Information Center to make phone calls would also raise obvious security problems. Operational commanders are tasked with completing diverse missions with limited resources in a dynamic environment. Plaintiffs fail to provide the Court with any cases ruling that judicially manageable standards exist to evaluate resource allocation and security considerations on underway military vessels.

This case also satisfies the final four *Baker* factors (the "prudential factors"), such as concerns about multifarious pronouncements on one question. *Al-Tamimi v. Adelson*, 916 F.3d 1, 12 (D.C. Cir. 2019). Plaintiffs argue that the prudential factors are not present because they "do not challenge that [State Department] certification or the factual basis underlying it . . . ." Opp'n at 31. Prudential factors indeed counsel against judicial involvement in this matter, given that Congress has foreclosed criminal defendants from looking beyond the State Department Certification to challenge the diplomacy that led to the United States' exercise of jurisdiction over them, *see* 46 U.S.C. § 70502(c)(2)(B); *United States v. Hernandez*, 864 F.3d 1292, 1299–1301 (11th Cir. 2017). Further, any ruling by the Court could implicate the sovereign rights of

Jamaica. The United States and Jamaica complied with the 1988 Vienna Counter-Narcotics Treaty and the Bilateral Agreement, and neither State has found cause here to use the dispute resolution methods of either treaty. A ruling by the Court pronouncing that the United States should not have waited for Jamaica to conclude its deliberative process – something Plaintiffs expressly propose in their Response – could only follow a conclusion that unilateral action was necessary due to Jamaica's taking a few weeks to deliberate. This question is for the political branches to decide through diplomatic channels. Even looking solely at the conditions of detention aboard cutters at sea, those conditions are a subject for diplomatic channels as well. Negotiations and diplomacy could be used to address the details of detention, as well as invocation of the provisions of the Bilateral Agreement such as each party's right to embark on the other party's law enforcement vessels. Bilateral Agreement, art. 7-9.

**(2)     The Cases Cited by Plaintiffs Do Not Support Justiciability.**

Plaintiffs provide no new cases on point. They rely on criminal cases (Opp'n at 30), conventional maritime tort cases not raising political questions (Opp'n at 31), a *Bivens*-type case (Opp'n at 33), prize cases[2] (Opp'n at 19), and cases addressing the political question doctrine to which the United States was not a party (Opp'n at 28). The law of this Circuit recognizes the constitutional character and importance of the political question doctrine. *El-Shifa Pharm. Indus., Co. v. United States*, 607 F.3d 836, 841 (D.C. Cir. 2010) (affirming dismissal of tort lawsuit challenging military's allegedly unjustified decision to bomb a pharmaceutical plant in

---

[2] A prize case is a specialized type of action, not applicable here, with a unique and lengthy history in international admiralty law. Briefly, when allowed under law, a captain could capture an enemy vessel and bring it to a prize court through an action called libel *in rem*. *See* U.S. CONST. art I, § 8, cl. 11; 28 U.S.C. § 1333. If ruled in the captain's favor, the vessel and cargo would be sold and split among creditors, who might include the captain and crew. The history of prize cases such as those cited (*Little v. Barreme* and *L'Invincible*) is not relevant to this case, nor can they be considered ordinary maritime tort cases.

Sudan); *Schneider v. Kissinger*, 310 F. Supp. 2d 251 (D.D.C. 2004), *aff'd*, 412 F.3d 190 (D.C. Cir. 2005). The admiralty cases cited in the United States' opening brief – primarily *Wu*, *Aktepe*, *Tarros*, and *Chaser* – are far and away the closest on point factually and legally.[3] ECF 12-1, U.S. Br. at 25-27. Each establishes precedent for the nonjusticiability of this case.

Plaintiffs cite the Ninth Circuit *Tobar* case. Opp'n at 19, 27; *Tobar v. United States*, 731 F.3d 938 (9th Cir. 2013). In *Tobar*, an owner sued the United States for damage to his Ecuadorian-flagged vessel during a Coast Guard search (among other claims, which were dismissed). The court ruled that Ecuador's *ad hoc* authorization to board and search the vessel required the United States to pay compensation for any property damage, as long as neither the vessel nor the crew were involved in illicit action. *Id*. at 946; *see also Tobar v. United States*, No. 07-cv-817, 2016 WL 1367224 (S.D. Cal. Apr. 5, 2016) (entering judgment for the United States after remand). Unlike that *ad hoc* agreement, the U.S.-Jamaica Bilateral Agreement contains no provision regarding payment of damages. The *Tobar* case also lacked the indicia of a political question seen here, such as the need to accord respect to Jamaica's sovereignty as it undertook its internal deliberative process, and also the security concerns of a multi-week detention of trafficking suspects at sea. *Tobar* shows that the nonjusticiability doctrine does not arise in every case of a maritime interdiction (and indeed it was not even raised as a defense there), but only when the case would require the Court to answer a political question, *i.e.*, one constitutionally committed to the political branches of government.[4]

---

[3] *Wu Tien Li-Shou v. United States*, 777 F.3d 175 (4th Cir. 2015), *cert. denied* 136 S. Ct. 139 (2015); *Aktepe v. United States*, 105 F.3d 1400 (11th Cir. 1997); *Tarros S.p.A. v. United States*, 982 F. Supp. 2d 325 (S.D.N.Y. 2013); *Chaser Shipping Corp. v. United States*, 649 F. Supp. 736 (S.D.N.Y. 1986), *aff'd*, 819 F.2d 1129 (2d Cir. 1987).

[4] The political question doctrine also was not raised in the other cases cited on page 19 of Plaintiffs' response; *Coumou v. United States*, 107 F.3d 290 (5th Cir. 1997), *modified on rehearing*, 114 F.3d 64 (5th Cir. 1997) (remanding for trial to determine the United States'

**(3) Plaintiffs' Opposition Concedes Underlying Facts.**

Plaintiffs have attempted to clarify their position on the underlying facts. Plaintiffs state they are not contesting the facts of the State Department Certification: "Plaintiffs do not challenge that certification or the factual basis underlying it." Opp'n at 31. Plaintiffs also admit that, for purposes of this action, they "have assumed that the Coast Guard's *initial* stop and detention of Plaintiffs were lawful." Opp'n at 8, n.1.

It remains unclear whether Plaintiffs dispute the facts of their plea agreements and factual proffers, all signed while Plaintiffs were represented by counsel and adopted by them in open court in the Southern District of Florida. Plaintiffs admit the Coast Guard's initial stop and detention were lawful means, which must also mean they admit the Coast Guard had probable cause to believe they were engaged in illicit trafficking. Yet Plaintiffs continue to assert that the Coast Guard "wrongly" suspected them of drug trafficking. Opp'n at 2.

Plaintiffs make conflicting representations regarding their acceptance (or not) of the factual basis underlying the State Department Certification. In their brief, Plaintiffs appear to argue that the United States conducted the search, seizure, and detention only pursuant to domestic law (Opp'n at 3, 14), and thus presumably not under the authority of the flag state, Jamaica. The Certification proves that the boarding, search, and seizure were done under the authorization of the flag state, pursuant to the Bilateral Agreement, and that the United States did

---

liability under the Public Vessels Act for directing a suspect Honduras-flagged vessel to St. Marc, Haiti, then negligently failing to inform Haitian police that the vessel's master, a U.S. citizen, had been the one who tipped off the Coast Guard about the crew's suspected drug smuggling, which led to the master's injuries during incarceration in Haiti); *Harrington v. United States*, 748 F. Supp. 919 (D.P.R. 1990) (ruling that the State Department did not act negligently in determining that the plaintiffs' vessel was stateless because the claimed flag-state refuted it); *Harrell v. United States*, 875 F.2d 828 (11th Cir. 1989) (ruling that Coast Guard officer had qualified immunity for his actions in stopping and boarding a U.S.-flag vessel and detaining the plaintiffs in counter-narcotics operation).

not assert jurisdiction over the detainees to enforce United States law until *after* Jamaica waived its jurisdiction over them, on October 9, 2017.  ECF 12-2, Ex. A, Certification.  The Certification also establishes that the Coast Guard recovered 613 pounds of marijuana.  *Id*.

To the extent Plaintiffs are not disputing the criminal record or the legality of the initial stop and detention, the Court can place into context the statements of the Assistant United States Attorney at the plea hearing.  ECF 12-6, Ex. E at 24.  He explained that the ion scans were "contradictory," in that they revealed the presence on JOSSETTE of drugs other than marijuana, but only marijuana was recovered.  *Id*.  Because the government was uncertain whether it could prevail beyond a reasonable doubt at trial, the parties agreed to an upward adjustment to a lesser charge than the drug charge.  *Id*. at 22-25.  The government's statements at the plea hearing, especially in light of the agreed upward adjustment, do not indicate a "total lack of evidence connecting the men with trafficking drugs," as Plaintiffs claim.  Opp'n at 7.

**(4)    Plaintiffs' Opposition Fails to Clarify their Position on Declaratory and Injunctive Relief.**

Plaintiffs purport to clarify their position on declaratory and injunctive relief, but have not done so.  In its overreaching, the Complaint seeks injunctive and declaratory relief, including a declaration that "the acts alleged herein are unlawful" and that "the Coast Guard policy, practice, or procedures alleged herein is unlawful and violates maritime law."  ECF 1 at 36.  Plaintiffs ask the Court to "enjoin the Coast Guard's future use of the unlawful policy, practice, and procedures," and "order the Coast Guard to implement alternative policies, practices, or procedures . . . ."  *Id*.  In their Complaint, only one of Plaintiffs' requests for relief is for damages, while four requests seek declaratory or injunctive relief.  *Id*.

Plaintiffs may now wish to minimize their extraordinary requests for declaratory and injunctive relief because those requests so strongly implicate the factors that caution judicial

forbearance under *Baker v. Carr*. Plaintiffs "clarify that the scope of the declaratory and injunctive relief they seek is such relief as will prevent the Coast Guard from again subjecting them to the same mistreatment . . . ." Opp'n at 13, n.2. Plaintiffs also suggest the Court sever their request for declaratory and injunctive relief if necessary to prevent the entire action from being dismissed. Opp'n at 32.

These purported concessions make no difference for the Court's legal analysis. Plaintiffs' Complaint essentially seeks the Court's assurance that they may run a go-fast boat at sea without having to be "fearful of being apprehended and detained by the Coast Guard again." ECF 1 at 4, ¶ 11. Such an extraordinary remedy would place the Court in the middle of the Coast Guard's bilateral counter-trafficking operations with Jamaica. The Complaint asks the Court to require the Coast Guard to implement alternative policies, practices, and procedures in operations where the United States is engaged in diplomacy with a foreign nation under applicable treaties. Judicial forbearance is appropriate here, where the Court is not in the position of monitoring State-to-State negotiation, including the specifics of a particular detention, or the more general question of whether the States wish to enter an agreement about brig space or accommodations on their respective vessels.

**(5)      Framing the Complaint as a Maritime Tort Does Not Make this Case Justiciable.**

Framing this action as a maritime tort does not make it justiciable. Plaintiffs' multiple demands for injunctive and declaratory relief show that this is no ordinary maritime tort action. The suit is an attempt to alter the policies and practices of the Coast Guard, the Department of State, and possibly even Jamaica, given the complaints about the duration of the detention.

Courts have rejected tort-styled actions that raise nonjusticiable political questions. In holding that the political question doctrine barred a tort action arising from the allegedly

mistaken bombing of a pharmaceutical plant in Sudan, the D.C. Circuit held that the doctrine "bars our review of claims that, *regardless of how they are styled*, call into question the prudence of the political branches in matters of foreign policy or national security constitutionally committed to their discretion." *El Shifa*, 607 F.3d at 842 (emphasis added).  Similarly, in *Aktepe*, where a series of miscommunications led to the Navy's firing upon NATO allies in a training mission, the maritime tort action was dismissed because it implicated foreign policy and military discretion.  "The interjection of tort law into the realms of foreign policy and military affairs would effectively permit judicial reappraisal of judgments the Constitution has committed to the other branches." *Aktepe v. United States*, 105 F.3d 1400, 1404 (11th Cir. 1997).

Plaintiffs attempt to draw upon the long-standing history of maritime law (Opp'n at 19), but this case is not a garden-variety tort.  The Coast Guard has jurisdiction to conduct certain maritime enforcement actions on the high seas, yet Plaintiffs argue that the Court should not draw guidance from the cited naval cases (*Aktepe*, *Wu*, *Tarros*) or CIA harbor-mining case (*Chaser*) because those were not Coast Guard cases.  Opp'n at 29.  To the contrary, those cases are the most similar, both factually and legally, given the maritime context.  All four of those cases were brought under the Suits in Admiralty Act or the Public Vessels Act.

Both the President and Congress have declared their support for counter-trafficking measures, which mission the Coast Guard was undertaking at the time of Plaintiffs' detention.  The United States was bound by the 1988 Vienna Counter-Trafficking Convention and the Bilateral Agreement with Jamaica during the detention of Plaintiffs.  If Congress or any of the international participants desired a private cause of action to accrue from the detention of drug

trafficking suspects caught on the high seas, the domestic or international laws applicable to this detention would have said so.[5]

Plaintiffs cite no justiciable cases that involve diplomacy and treaties like this one. They argue that they are not seeking enforcement of the treaty agreements (Opp'n at 13), which, of course, they could not do under the terms of either. And yet Plaintiffs quote the Bilateral Agreement in asking the Court to require the Coast Guard officers to "observe norms of courtesy, respect, and consideration for persons on board the suspect vessel." Opp'n at 31, quoting Bilateral Agreement, art. 3, ¶ 4. Plaintiffs seek to minimize the importance and the binding nature of the Bilateral Agreement, claiming that the Agreement "merely outlines the mechanism" for Jamaica to permit the Coast Guard to board and search a Jamaican-flagged vessel. This confuses the meaning and function of the Bilateral Agreement, as does Plaintiffs' argument that the Agreement does "not strip jurisdiction over legal questions from U.S. courts." Opp'n at 22. These arguments mix up the importance of the Bilateral Agreement on the United States' foreign relations. Once Plaintiffs claimed Jamaican nationality, and Jamaica confirmed it, the boarding, search, and detention were governed by the Bilateral Agreement, which protects Jamaica's sovereign interest in protecting its nationals, and sets forth their rights. The agreement with Jamaica did not establish reciprocal grounds to bring damages claims in either country

---

[5] Plaintiffs cite the Detainee Treatment Act, 42 U.S.C. § 2000dd-2, which was enacted in 2005 as part of the United States' condemnation of the use of torture. This statute does not apply here, and, even if it did, it provides no private cause of action for alleged violations of the statute. *In re Iraq and Afghanistan Detainees Litig.*, 479 F. Supp. 2d 85, 107 n.23 (D.C. Cir. 2007), aff'd *Ali v. Rumsfeld*, 649 F.3d 762 (D.C. Cir. 2011) ("Congress has twice issued legislation addressing detainee treatment without creating a private cause of action for detainees injured by military officials, which this Court takes to be some indication that Congress' inaction in this regard has not been inadvertent."). In *In re Iraq*, as in the present case, any recourse would have been through diplomacy, not a private cause of action in the federal court. *Id*. at 116-17.

relating to interdictions and detentions.  Labeling Plaintiffs' allegations as maritime tort claims does not redeem the non-justiciable nature of this private cause of action.

**(6)     The Primary Complaint Remains the Prolonged Nature of the Detention.**

Plaintiffs' Complaint did not mention that 25 of the 32 days of the detention were spent pending Jamaica's determination on whether to waive its right to jurisdiction.  Once the United States received the waiver, the Coast Guard immediately transferred Plaintiffs to a vessel bound for Miami and brought them to shore in just seven days.  Plaintiffs now seek to minimize their primary complaints about the length of the detention.  Plaintiffs assert that the length of the detention is not the cornerstone of their argument, and yet they raise it consistently in the opposition.  Opp'n at 3 (thirty-two days); 13, 27 (characterizing the alleged maritime tort as "prolonged detention"); 23 ("one-month-plus detention").  The "prolonged" custody, from which all their complaints flow, and which frames the logistical considerations of the care they received while detained on Coast Guard cutters at sea, was a result of the United States waiting for Jamaica to reach the significant decision about waiving jurisdiction over its nationals.  This is a matter of foreign relations that the Constitution commits solely to the political branches.

**(7)     Plaintiffs Misstate the Jurisdiction Waiver Process.**

Plaintiffs mix up shipboarding with the right to exercise jurisdiction over another State Party's nationals.  Under the Bilateral Agreement, the two nations agreed to allow each other to board and search suspect vessels of the other's nationality, upon request and authorization. Bilateral Agreement, art. 3.  The flag state still retains the right to exercise jurisdiction over the vessel, its cargo, and persons on board, but may waive its right to permit the other party to enforce its laws.  "Nothing in this Agreement shall be construed as a waiver by a Party of its right to exercise jurisdiction over its nationals."  Bilateral Agreement, art. 3, ¶ 5.

As detailed in the Certification of the Department of State, this was a two-step process: first, requesting authorization to board and search the vessel, and second, requesting that Jamaica waive its primary right to exercise jurisdiction over the vessel, cargo, and crew to the extent necessary for the enforcement of United States law. ECF 12-2, Ex. A, State Dep't Cert. Jamaica's giving permission to board and search was not the same as giving the United States permission to exercise jurisdiction over JOSSETTE's crew for criminal law enforcement. Once Jamaica confirmed Plaintiffs' nationality, the boarding and search were under Jamaica's authorization, as was the detention during the pendency of the flag state's deliberative process on jurisdiction. Bilateral Agreement, art. 3. Plaintiffs' cavalier suggestion that the United States should have brought them into the United States as criminal suspects earlier – before obtaining Jamaica's waiver of jurisdiction – ignores the realities of the treaties, the relationship between Jamaica and the United States, and the nature of diplomacy.[6] The suggestion, to disregard Jamaica and hurry things up, underscores that Plaintiffs' fundamental complaint is about the length of detention.

The United States agrees with Plaintiffs that courts have held that MDLEA consent can relate back to activity that occurred before consent. Opp'n at 23, citing *United States v. Greer*, 285 F.3d 158, 175 (2d Cir. 2002). This Circuit has explained the MDLEA consent and

---

[6] Plaintiffs argue that, in the actions they filed in the Southern District of Florida this year attempting to overturn their criminal convictions, the United States stated that it obtained jurisdiction over Plaintiffs on September 14, the date of the boarding and search. Opp'n at 15. That is not exactly what the United States said. In that brief, the United States explained that Jamaica first authorized the U.S. Coast Guard to board and search (*Ferguson v. United States*, ECF 15 at 2, No. 19-cv-22901 (S.D. Fla. Aug. 27, 2019)), and later waived jurisdiction over the vessel, so the vessel was subject to the jurisdiction of the United States under the MDLEA (*id.*). *Accord Weir v. United States*, ECF 15 at 2, No. 19-cv-23420 (S.D. Fla., Sept. 30, 2019). That is the same thing the United States says in this case, about the two-step process. Nothing in the S.D. Fla. briefs indicates that Jamaica waived its primary right to exercise jurisdiction over its nationals on September 14, 2017. Rather, the conclusive State Department Certification sets forth the timeline, establishing that Jamaica did not waive jurisdiction until October 9. (Ex. A.)

certification in detail in *United States v. Mosquera-Murillo*, 902 F.3d 285 (D.C. Cir. 2018) and *United States v. Miranda*, 780 F.3d 1185 (D.C. Cir. 2015).  Nothing in those cases or in the MDLEA indicates a desire by Congress for the Executive to ignore considerations of foreign relations and diplomacy by bringing trafficking suspects into the United States during the period when a foreign partner is engaging in internal deliberations on the subject.  Plaintiffs are inviting the Court to spark a foreign-relations incident by issuing an injunction that would infringe upon the powers of the Executive to use diplomacy and treaties to work toward counter-trafficking enforcement with our sovereign neighbors.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that this case be dismissed.  Fed. R. Civ. P. 12(b)(1).

DATED:  November 26, 2019                Respectfully submitted,

                                                                   JOSEPH H. HUNT
                                                                   Assistant Attorney General

                                                                   JESSIE K. LIU (D.C. Bar 472845)
                                                                   United States Attorney

                                                                   By:  /s/   *Jill Rosa*
                                                                   DOUGLAS M. HOTTLE
                                                                   JILL DAHLMANN ROSA (D.C. Bar 451578),
                                                                   Senior Trial Counsel
                                                                   THOMAS M. BROWN
                                                                   JUSTIN R. JOLLEY
                                                                   Trial Attorneys
                                                                   U.S. Department of Justice
                                                                   Civil Division, Torts Branch
                                                                   Aviation, Space & Admiralty Litigation
                                                                   P.O. Box 14271
                                                                   Washington, DC 20044
                                                                   (202) 616-2973, Douglas.Hottle@usdoj.gov
                                                                   (847) 732-1141, Jill.Rosa@usdoj.gov
                                                                   (202) 616-4112, Thomas.M.Brown@usdoj.gov
                                                                   (202) 616-4035, Justin.R.Jolley@usdoj.gov

                                        Fax:  (202) 616-4002
                                        Attorneys for the United States

Of Counsel:

LT Michael P. Maloney, Esq.
U.S. Coast Guard
2703 Martin Luther King Jr. Ave, SE, Stop 7213
Washington DC 20593-7213
(202) 372-3779