**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**IN ADMIRALTY**

| | |
|---|---|
| **ROBERT DEXTER WEIR, *et al.*,** | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No. 19-1708 (TFH)** |
| **UNITED STATES OF AMERICA, *et al.*,** | |
| **Defendants.** | |

**MEMORANDUM OPINION**

The plaintiffs in this case are Jamaican fishermen who the United States Coast Guard detained for 32 days before bringing them to the United States for prosecution in the Southern District of Florida. They challenge the Coast Guard's treatment of them during their detention on Coast Guard ships. Pending before the Court is the defendants' motion to dismiss the Complaint on the grounds that all claims raised in the Complaint present a non-justiciable political question. [ECF No. 12]. The plaintiffs have opposed the motion, [ECF No. 16], and the defendants have filed a reply, [ECF No. 18].

**I.     Background**

    **A.     Factual Allegations**

On the night of September 13, 2017, plaintiffs Robert Weir, Patrick Ferguson, Luther Patterson and David Williams left Half Moon fishing village near Falmouth, Jamaica, in the *Josette*, a 32-foot Jamaican-registered fishing boat. Compl. ¶ 23. The four Jamaican fishermen were headed to retrieve fish traps that Mr. Ferguson had left a few days earlier in the Morant Cays, an island group located in Jamaican territorial waters seven to eight hours from Falmouth.

1

*Id.* ¶ 23. They planned to spend the day on the cays and return late in the evening on September 14, 2017. *Id.* ¶ 24. On the boat, they carried fishing gear, overnight bags, Mr. Ferguson's fighting cock, Jah Roos, and clothes for his two-year old daughter. *Id.* ¶¶ 25-26. Hours after departing, a storm caused the boat's main engine to lose power, and the boat drifted off course. *Id.* ¶ 27. On the morning of September 14, the now-lost crew navigated towards the nearest visible landmass, without realizing that it was Haiti. *Id.* ¶ 28.

Later that morning, officers on the United States Coast Guard Cutter *Confidence* saw the *Josette* heading for Haiti. *Id.* ¶ 29. They suspected the *Josette*'s crew of drug trafficking. Coast Guard officers intercepted the *Josette* around noon, and searched the boat for three or four hours. *Id.* ¶ 30; 36. The officers used an ion-scan detection device, but found no marijuana or traces of marijuana in the *Josette* or on the crew. *Id.* ¶ 37. The plaintiffs provided identification, and told the Coast Guard that they were fishermen. *Id.* ¶ 34-35.

The Coast Guard officers then transported the plaintiffs to the *Confidence*, and killed Jah Roos. *Id.* ¶ 39. On board the *Confidence*, officers ordered the plaintiffs to remove their clothes and shoes, confiscated their clothing and overnight bags, and gave them "paper-thin coveralls and a pair of thin, disposable slippers." *Id.* ¶ 40-41. They chained the plaintiffs by their ankles to metal cables on the ship's deck. *Id.* ¶ 42. The Coast Guard shot a flair at the *Josette* and "riddled its hull with bullets," causing the boat to catch fire and sink. *Id.* ¶ 43.

The *Confidence* sailed for about three days and four nights before stopping at the U.S. Naval Base at Guantanamo Bay. *Id.* ¶ 45. During that time, the Coast Guard kept the plaintiffs chained by their ankles, and only released them to relieve themselves. *Id.* As shelter, the Coast Guard officers gave them a "plastic tarpaulin" that provided little protection from the elements. The plaintiffs' skin "blistered due to exposure to the sun, wind and salt air." *Id.* ¶ 46. The Coast

Guard failed to provide them with washing facilities. They had to urinate over the side of the ship and defecate in a metal bucket, and were allowed one cold shower while aboard the *Confidence*. *Id*. ¶ 47. The Coast Guard provided them with "only a thin rubber mat to sleep on and a thin blanket," gave them briny water and "three identical meals a day: a meager ration of cold rice and beans." *Id*. ¶ 48-49. The plaintiffs repeatedly asked Coast Guard officers to allow them to call their families to tell them they were alive, or to do so on their behalf, but the officers refused. *Id*. ¶ 51.

When the *Confidence* docked at Guantanamo Bay, the Coast Guard transferred the plaintiffs to a second ship. *Id*. ¶ 53. The Coast Guard chained them to the deck of this ship for more than a week, and refused their requests to contact their families. *Id*. ¶¶ 56, 58. The ship set sail for Puerto Rico with Hurricane Maria, a Category 5 hurricane, churning nearby. *Id*. ¶ 57. "Even during the worst of the storm when high winds battered the men and rain and seawater constantly drenched them, the Coast Guard refused to allow the men to shelter inside the ship." *Id*. ¶ 59. Officers told the plaintiffs there was no tarpaulin onboard to shelter them. *Id*. The ship "pitched, rolled and swayed," and the plaintiffs, chained to the ship's deck, feared they would be severely injured or that the cables restraining them would break and they would be "washed overboard to their deaths." *Id*. ¶ 60.

The Coast Guard gave them two thin sheets for bedding, a "shared metal bucket for a toilet" and allowed them to take two or three cold showers. *Id*. ¶ 61-62. The plaintiffs developed saltwater rashes and fungal infections. *Id*. The food they were provided was rancid and consisted only of small helpings of rice and beans. The drinking water was briny and made the plaintiffs nauseous. *Id*. ¶ 63. They developed ear, nose, throat, chest and skin infections from exposure to

the elements. *Id*. ¶ 64. The Coast Guard informed them there was no doctor onboard, and their injuries went untreated. *Id*.

After briefly docking in St. Thomas, in the US Virgin Islands, the ship sail for Puerto Rico and docked in San Juan a few days later. *Id*. ¶ 65-66. While in the port, the plaintiffs could not discard the contents of their bucket toilet or use the ship's indoor toilet; instead, they had to "sit next to the bucket, filled with feces, for the two days and two nights that the ship remained there." *Id*. ¶ 67. The plaintiffs began to contemplate suicide. *Id*. ¶ 69.

Two days after leaving the port of San Juan, the plaintiffs were transferred to a third ship where, although still chained to the deck of the ship, they were held in better conditions. *Id*. ¶¶ 71-72. The Coast Guard allowed them to sleep under a covered enclosure, provided them with a rubber mat and blanket, and allowed them to use an enclosed portable toilet and to shower every other day. *Id*. ¶¶ 73-74. They provided the men with better meals – adding meat or chicken to the rice and beans, and occasionally giving them fruit and vegetables. *Id*. ¶ 75. The Coast Guard still gave the plaintiffs briny water that made them nauseous. *Id*. They began to experience symptoms of dehydration. *Id*. ¶ 75. A medic saw the plaintiffs and provided them with some treatment for their physical injuries. *Id*. ¶ 76.  The Coast Guard continued to deny their requests to notify their families. *Id*. ¶ 77.

Around October 13, the Coast Guard transferred the plaintiffs to a fourth ship that docked off the coast of Miami on October 16, 2017. *Id*. ¶¶ 78; 85. The Coast Guard again chained them to the deck of the ship.  *Id*. ¶ 79. The Coast Guard only released them to use a shared metal bucket as a toilet, and to take a cold, salt-water shower after a "sewage pipe next to them burst, soaking the deck and the men in feces and other excrement." *Id*. ¶ 81. The Coast Guard gave them thin blankets, with nothing to sleep on, and three small daily portions of rice and beans

"served cold and often rancid." *Id*. ¶ 83. Although the Coast Guard informed them that there was not enough food, the men could smell fresh meals being cooked elsewhere on the deck. *Id*.

During their 32-day detention, the Coast Guard did not inform the men how long it would hold them or where it would take them. *Id*. ¶ 84.  By the time they reached Miami, they were gaunt, and physically and psychologically traumatized. *Id*. Their families believed they were dead, and began selling their personal possessions and livestock. *Id*. ¶ 88.

 The government originally charged the plaintiffs with conspiracy to possess with intent to distribute 100 kilograms or more of marijuana, in violation of the Maritime Drug Law Enforcement Act ("MDLEA"), 46 U.S.C. §§ 70503(a)(1) and 70506(b), before dropping those charges and instead charging them with providing materially false information to a federal law enforcement officer. *Id*. ¶ 89. The men pled guilty to that charge, even though they now assert that they had not lied to law enforcement officials. *Id*. ¶ 91. They served 10 months in prison, and two months in federal immigration detention.  *Id*. ¶¶ 91; 93. Since returning home, Mssrs. Weir, Patterson, and Williams only fish in Jamaican territorial waters and do not venture into international waters, even though the catch is smaller and less lucrative. *Id*. ¶ 95. Mr. Ferguson has not ventured out to sea at all. *Id*.

### B.    Procedural History

The plaintiffs filed their Complaint against the United States and Admiral Karl L. Schultz, Commandant of the United States Coast Guard, in June of 2019. Counts One through Seven of the Complaint assert tort claims for false imprisonment, negligence, conversion, battery, assault, intentional infliction of emotional distress, and negligent infliction of emotional distress, respectively. Counts Eight through Ten assert customary international law claims for forced disappearance, inhuman or degrading treatment, and prolonged arbitrary detention. Count Eleven seeks declaratory and injunctive relief for the defendants' violations of maritime law.

The plaintiffs bring all their claims except Count Three (Conversion) under the Suits in Admiralty Act ("SAA"). *See* 46 U.S.C. § 30903(a) ("In a case in which, if a vessel were privately owned or operated, or if cargo were privately owned or possessed, or if a private person or property were involved, a civil action in admiralty could be maintained, a civil action in admiralty in personam may be brought against the United States . . . ."). They bring their conversion claim under the Public Vessels Act ("PVA"), which allows plaintiffs to bring claims for damages caused directly by public vessels. 46 U.S.C. § 31102(a) (allowing "civil action[s] in personam in admiralty" against the United States for "damages caused by a public vessel of the United States"); *see Uralde v. United States*, 614 F.3d 1282, 1286 (11th Cir. 2010) ("Claims seeking relief for damages caused directly by a public vessel, or by the negligent operation thereof, fall under the PVA. The SAA covers all remaining admiralty claims, including those simply *involving* public vessels.") (internal quotation marks omitted).

The defendants have moved to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) on the grounds that the entire Complaint presents a political question. They argue that the plaintiffs seek to re-engineer the Coast Guard's anti-trafficking policy. They also contend that the Coast Guard was bound by two treaties—the United Nations Convention against Illicit Traffic in Narcotic Drugs and Psychotropic Substances and a 1997 bilateral agreement between the United States and Jamaica—to wait until Jamaica waived jurisdiction before bringing the men to shore. They argue that to adjudicate any of the plaintiffs' claims, the Court will have to answer whether the United States contravened the treaties, or second-guess the Executive's decision to wait until Jamaica waived jurisdiction before bringing the plaintiffs to shore. Mot. to Dismiss at 15.

### C.     Statutory and Treaty Background

####     1.     The Maritime Drug Law Enforcement Act

The Coast Guard was enforcing the Maritime Drug Law Enforcement Act ("MDLEA") when it boarded and searched the *Josette*. 46 U.S.C. § 70501 *et seq.*. Enacted in 1986, the MDLEA prohibits individuals on board covered vessels from, *inter alia*, possessing with the intent to distribute controlled substances "even though the act is committed outside the territorial jurisdiction of the United States." 46 U.S.C. § 70503(a)(1); (b); *see United States v. Carvajal*, 924 F. Supp. 2d 219, 232 (D.D.C. 2013) (discussing the history of the MDLEA). A foreign-flagged vessel, such as the *Josette*, is "subject to the jurisdiction of the United States" when the foreign nation where the vessel is registered "has consented or waived objection to the enforcement of United States law by the United States." *Id*. § 70502(c)(1)(C). Consent or waiver is "prove[n] conclusively by certification of the Secretary of State or the Secretary's designee." *Id*. § 70502(c)(2). Criminal defendants who are charged with violating the MDLEA do "not have standing" to raise the government's failure to comply with international law as a defense to prosecution. *Id.* § 70505; *see also id.* (providing that "[a] claim of failure to comply with international law in the enforcement of this chapter may be made only by a foreign nation.").

####     2.     The United Nations Convention Against Illicit Traffic In Narcotic Drugs and Psychotropic Substances

The United Nations Convention against Illicit Traffic in Narcotic Drugs and Psychotropic Substances was enacted due to the "magnitude of and rising trend in the illicit production of, demand for and traffic in narcotic drugs and psychotropic substances . . . ." Dec. 20, 1988, 1582 U.N.T.S. 95 (the "Convention"). Article 17 of the Convention commits the State-signatories to cooperate on combatting drug trafficking at sea. *Id*. Art. 17. Under Article 17, State-signatories must request authorization from another State to board and search a vessel possessing the latter's nationality, and "[i]f evidence of involvement in illicit traffic is found, take appropriate action

7

with respect to the vessel, persons, and cargo on board." *Id*. Art. 17 ¶ 4. When signatories board and search vessels pursuant to Article 17, they "shall take due account of the need not to endanger the safety of life at sea, the security of the vessel and the cargo. . . ." *Id*. ¶ 5. Article 17 also provides that the "[p]arties shall consider entering into bilateral or regional agreements or arrangements to carry out, or to enhance the effectiveness of" Article 17. *Id*. ¶ 9.

### 3.    The United States—Jamaica Bilateral Agreement

In 1997, the United States and Jamaica signed a bilateral agreement concerning "Cooperation in Suppressing Illicit Maritime Drug Trafficking." Jam.-U.S., May 6, 1997, T.I.A.S. No. 98-310 ("Bilateral Agreement"). Article 3 of the Bilateral Agreement governs "shipboarding" in "operations seaward of the territorial sea." *Id.* Art. 3. It provides the following:

> Whenever the law enforcement officials of one Party (the "first Party") encounter a vessel . . . [suspected of illicit trafficking] . . . flying the flag of, or claiming to be registered in, the other Party, located seaward of any nation's territorial sea, and have reasonable grounds to suspect that the vessel is engaged in illicit traffic, the first Party may request . . . the Party which is the claimed flag State to verify the claim of registry and if verified, to authorize the boarding and search of the suspect vessel, cargo and persons found on board by the law enforcement officials of the first Party.

*Id*. ¶ 1. "Where permission to board and search the vessel is granted and evidence is found of illicit traffic," the flag state will be "promptly informed of the results of the search . . . and requested to give directions as to the disposition of the vessel, cargo and persons on board." *Id*. ¶ 2. The requests should be answered "expeditiously," and "[p]ending receipt of such instructions, the vessel, cargo and persons on board may be detained." *Id.*  Law enforcement officials "conducting a board and search . . . shall take due account of the need not to endanger the safety of life at sea" and "the security of the suspect vessel and its cargo." *Id*. ¶ 4. They "shall also bear in mind the need to observe norms of courtesy, respect and consideration for the persons on board the suspect vessel." *Id*.

The Bilateral Agreement includes a provision on the jurisdictional rights of States during shipboarding:

> Where a vessel of one Party is detained seaward of any State's territorial sea, that Party shall have the right to exercise jurisdiction over the vessel, its cargo and persons on board, but that Party may, subject to its Constitution and laws, waive its right to exercise jurisdiction and authorize the other Party to enforce its laws against the vessel, its cargo and persons on board. Nothing in this Agreement shall be construed as a waiver by a Party of its right to exercise jurisdiction over its nationals.

*Id*. ¶ 5.

Finally, the Bilateral Agreement includes a dispute resolution clause providing that "[i]f any loss or injury is suffered as a result of any action taken by the law enforcement or other officials" or "any improper or unreasonable action is taken by a Party pursuant thereto, the Parties shall, without prejudice to any other legal rights which may be available to the Parties or to any persons or entities affected by any such action, consult at the request of either Party to resolve the matter and decide any questions relating to compensation." *Id*. Art. 20. Article 22, entitled "Preservation of Rights and Privileges," provides that "[n]othing in this Agreement is intended to prejudice the rights and privileges due any individual in any legal proceeding." *Id*. Art. 22.

## II.     Legal Standard

### A.     Rule 12(b)(1) of the Federal Rules of Civil Procedure

Under Rule 12(b)(1) of the Federal Rules of Civil Procedure, a district court must dismiss a complaint if it lacks subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1). When evaluating a motion to dismiss, the court must "treat the complaint's factual allegations as true . . . and must grant plaintiff the benefit of all inferences that can be derived from the facts alleged." *Sparrow v. United Air Lines, Inc.,* 216 F.3d 1111, 1113 (D.C. Cir. 2000) (internal quotation marks omitted). However, courts "are not bound to accept as true a legal conclusion couched as a

factual allegation . . . or to accept inferences drawn by plaintiffs if such inferences are

unsupported by the facts set out in the complaint." *Trudeau v. Fed. Trade Comm'n*, 456 F.3d

178, 193 (D.C. Cir. 2006) (internal quotation marks and citations omitted). Because Rule

12(b)(1) motions go to a court's jurisdiction, the court "may consider materials outside the

pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction." *Jerome

Stevens Pharm., Inc. v. Food & Drug Admin.*, 402 F.3d 1249, 1253 (D.C. Cir. 2005). The

plaintiff bears the burden of demonstrating subject matter jurisdiction. *Rempfer v. Sharfstein*, 583

F.3d 860, 868 (D.C. Cir. 2009).

## III.   Analysis

### A.   The Political Question Doctrine

The "political question doctrine concerns the jurisdictional 'case or controversy'

requirement of Article III of the Constitution . . . and the Court must address it *before* proceeding

to the merits." *Jaber v. United States*, 861 F.3d 241, 245 (D.C. Cir. 2017) (internal quotation

marks omitted); *see also Al Tamimi v. Adelson*, 916 F.3d 1, 8 (D.C. Cir. 2019) ("agree[ing] with

the district court's treatment of the doctrine as jurisdictional").

The nonjusticiability of a political question is "essentially a function of the separation of

powers . . . and excludes from judicial review those controversies which revolve around policy

choices and value determinations constitutionally committed for resolution to the halls of

Congress or the confines of the Executive Branch." *El-Shifa Pharm. Indus. Co. v. United States*,

607 F.3d 836, 840 (D.C. Cir. 2010) (en banc) (internal quotation marks omitted). The doctrine is

"a limited and narrow exception to federal court jurisdiction" that "mandates dismissal only if a

political question is inextricable from the case." *Al Tamimi*, 916 F.3d at 8 (internal quotation

marks omitted). Many cases involving foreign policy implicate the doctrine, but "'it is error to

suppose that every case or controversy which touches foreign relations lies beyond judicial

cognizance.'" *Japan Whaling Ass'n v. Am. Cetacean Soc'y,* 478 U.S. 221, 229-30 (1986)

(quoting *quoting Baker v. Carr,* 369 U.S. 186, 211 (1962)).

> A claim presents a political question if it involves the following:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*El-Shifa Pharm.*, 607 F.3d at 841 (quoting *Baker*, 369 U.S. at 217 (1962) (the "*Baker* factors")).

"'To find a political question, we need only conclude that one of these factors is present, not

all.'" *Id*. (quoting *Schneider v. Kissinger*, 412 F.3d 190, 194 (D.C. Cir. 2005) (edits accepted));

*but see Al Tamimi*, 916 F.3d at 12 (stating that recent Supreme Court jurisprudence *"suggests*

that, if the first two *Baker* factors are not present, more is required to create a political question

than apparent inconsistency between a judicial decision and the position of another branch.").

To decide whether a controversy presents a political question, courts must conduct a

"discriminating analysis of the particular question posed in the specific case." *Al Tamimi*, 916

F.3d at 8 (internal quotation marks omitted). Courts "follow a three-step process. First, we

identify the issues raised by the plaintiffs' complaint. Next, we use the six *Baker* factors to

determine whether any issue presents a political question. . . . Finally, we decide whether the

plaintiffs' claims can be resolved without considering any political question, to the extent one or

more is presented." *Id*. at 8. The D.C. Circuit "has clarified" how to determine "whether a case

involving foreign affairs is a political question . . . policy choices are to be made by the political

branches and purely legal issues are to be decided by the courts." *Id*. at 11.

11

**B.      What are the Issues Raised by the Complaint?**

     **1.      Count Eleven**

In Count Eleven, the plaintiffs ask the Court to declare that the defendants deprived them of their rights, to enjoin them from using such practices in the future, and to require the Coast Guard to implement alternative policies for its seizures of individuals at sea. Compl. ¶¶ 155-56 (Count XI). The defendants assail this request as seeking to "interject the judiciary into the United States' foreign relations and national security policy decision-making." Mot. to Dismiss at 19. The plaintiffs clarify that they request just "such relief as will prevent the Coast Guard from against subjecting them to the same mistreatment to which they were subjected when detained by the Coast Guard in 2017." Opp'n at 13 n.2. In any event, they assert that the request is extricable from their other claims.

The plaintiffs' request that the Court require the Coast Guard to implement a different policy for at-sea seizures of foreign nationals might indeed present a political question. *See Al-Tamimi*, 916 F.3d at 11 ("policy choices are to be made by the political branches and purely legal issues are to be decided by the courts").[1] More importantly, Count Eleven is only a request for declaratory and injunctive relief; it is not a separate cause of action. *See, e.g., Robinson v. Howard Univ., Inc.,* 335 F. Supp. 3d 13, 32 (D.D.C. 2018) ("[a] request for declaratory judgment constitutes a form of relief, not a cause of action"); *Base One Techs., Inc. v. Ali*, 78 F. Supp. 3d 186, 199 (D.D.C. 2015) ("Injunctive relief . . . is not a freestanding cause of action, but rather—as its moniker makes clear—a form of relief to redress the other claims asserted by Plaintiff"). Because Count Eleven does not include a cause of action, the Court will dismiss it. *See Robinson*, 335 F. Supp. 3d at 31–32 (dismissing plaintiff's claim for declaratory and injunctive

---

[1] In contrast, the part of Count Eleven seeking a judicial declaration that the Coast Guard deprived the defendants of their rights under maritime law does not raise a political question.

relief where the court dispensed with the plaintiff's other claims); *Base One Techs.*, 78 F. Supp. 3d at 199 (dismissing claim for injunctive relief).[2]

### 2.    Counts One Through Ten

Counts Two (Negligence), Four (Battery), Five (Assault), Six (Intentional Infliction of Emotion Distress), Seven (Negligent Infliction of Emotional Distress) and Nine (Cruel, Inhuman or Degrading Treatment in Violation of Customary International Law) challenge the harsh conditions of the Coast Guard's 32-day detention of the plaintiffs, including the Coast Guard's failure to provide adequate shelter, especially during a hurricane, sanitation, food, water, medical treatment and bedding, and the length of their detention. Compl. ¶¶ 109-115; 120-38; 145-49. As part of these claims, the plaintiffs question whether the Coast Guard should have brought the plaintiffs to shore sooner. Opp'n at 23. Counts Eight (Forced Disappearance) and Ten (Forced Disappearance and Prolonged Arbitrary Detention) question whether the Coast Guard should have notified the plaintiffs' families that they were being detained. Compl. ¶¶ 139-44; 150-54. Meanwhile, Count Three (Conversion) challenges the Coast Guard's destruction of the *Josette* and its contents. Compl. ¶ 116-19.

The defendants repeatedly assert that the primary focus of the plaintiffs' Complaint is the length of their detention. But as the foregoing paragraph demonstrates, the plaintiffs' challenge to the length of their detention is just one part of their Complaint, which overwhelmingly focuses on detention conditions. The defendants also contend that the plaintiffs ask the Court to second-guess "how the Coast Guard seeks appropriations from the Congress for larger cutters or cutters

---

[2] Because the plaintiffs seek this relief in their prayer for relief, they may still pursue it if they prevail on their other claims. Compl. at 36; *see Base One Techs.,* 78 F. Supp. 3d at 199 (concluding that striking a claim for injunctive relief was "procedural rather than substantive," that it did not preclude the plaintiff from seeking injunctive relief if it prevailed on its other claims, and that it was "premature at this stage [of the litigation] to consider the propriety of any particular remedy.").

with interior brig space for detainees." Mot. to Dismiss at 24. However, the Complaint's only mention of interior space relates to the plaintiffs' allegation that the Coast Guard refused to allow the men to shelter inside during a hurricane; it does not mention Congressional appropriations. Compl. ¶ 59. Just because the Court's ruling might impact the resources the Coast Guard needs to detain individuals in a lawful manner does not render the plaintiffs' challenge to their detention conditions nonjusticiable.

Finally, the defendants contend that the Complaint asks the Court to determine whether the United States violated the Convention and the Bilateral Agreement. But as the plaintiffs argue, they have asserted tort and customary international law claims; they do not allege that either the United States or Jamaica violated its treaty obligations and they do not seek to assert any rights under the treaties. Opp'n at 13. Accordingly, this question is not before the Court.

**C.      Do the Issues Raised by the Complaint Present Any Political Questions?: Applying the *Baker* Factors**

**1.      Is There a Textually Demonstrable Constitutional Commitment of the Issue to a Coordinate Political Department?**

The defendants argue that the length and conditions of the plaintiffs' detention are matters of foreign affairs and national security constitutionally committed to the political branches. Mot. to Dismiss at 20. They assert that the "key fact" in this case is that the Coast Guard detained the plaintiffs for the first 25 days while the Jamaican government determined whether to assert jurisdiction over them. *Id.* at 19. They contend that "once the *Josette*'s crew claimed Jamaican nationality, and Jamaica confirmed it" the Bilateral Agreement governed the United States' actions. Reply at 1. The defendants argue that questioning whether the United States should have brought the detainees to shore sooner while the Jamaican government engaged in "diplomatic deliberation" would infringe on powers constitutionally committed to the

14

Executive Branch because it would potentially offend Jamaica to bring the men to the United States without Jamaica's consent. *Id*. at 21.

The plaintiffs respond that determining mistreatment and destruction of property by the Coast Guard is not textually committed to the political branches. They contend that Courts have adjudicated maritime torts pursuant to the framework established by Congress by providing district courts with admiralty jurisdiction, and waiving sovereign immunity for suits against the United States via the SAA and the PVA. Opp'n at 18. They argue that the international law context of this suit does not render it non-justiciable because the Coast Guard was acting pursuant to the MDLEA when it detained them. *Id*. at 26.

Foreign policy and treaty-making are constitutionally committed to the Executive Branch. *See* U.S. Const., art. 2 § 2 (granting the President the power to "make treaties" and "appoint Ambassadors"). Plaintiffs cannot "clear the political question bar by simply recasting . . . foreign policy and national security questions in tort terms." *El-Shifa Pharm.*, 607 F.3d at 843 (internal quotation marks omitted). At the same time, "not every case that involves foreign affairs is a political question." *Al-Tamimi*, 916 F.3d at 11.

To persuade the Court that this case presents policy choices that are committed to the Executive Branch, the defendants cite cases where courts have declined to adjudicate tort claims because they challenged Executive Branch conduct pursuant to military decisions. Mot. to Dismiss at 17-18. For example, in *Bancoult v. McNamara*, the D.C. Circuit considered allegations stemming from the government's decision to construct a military base on the Indian Ocean Island of Diego Garcia during the Cold War, and to remove and relocate its Chagossian inhabitants. 445 F.3d 427 (D.C. Cir. 2006). Amongst their tort claims, the Chagossians alleged that they were "not fed during the six-day sea voyage in harsh conditions" when the military

moved them off the island. *Id*. at 430. The D.C. Circuit determined that "just as [it could not] review the decision to establish a base in the Indian Ocean . . . [it could not] review the manner in which that decision was carried out." *Id*. at 436. According to the Circuit, "[i]f [it] were to hold that the executive owed a duty of care toward the Chagossians, or that the executive's actions in depopulating the islands and constructing the base had to comport with some minimum level of protections, [the Circuit] would be meddling in foreign affairs beyond [its] institutional competence." *Id.* at 437; *see also id.* at 436 ("[t]he specific tactical measures allegedly taken to depopulate the Chagos Archipelago and construct the Diego Garcia base are as inextricably intertwined with the underlying strategy of establishing a regional military presence . . . .").

*Bancoult* is similar to this case because it challenged the military's treatment of foreign nationals on its ships. But *Bancoult's* context—a military decision to construct a military base on foreign territory—is so different from the instant case—the Coast Guard's detention of plaintiffs during a law enforcement operation—that it is not instructive. The Coast Guard detained the plaintiffs and brought them to shore for prosecution in the United States pursuant to the MDLEA. *Bancault* does not guide the Court as to whether the decisions made in this context are justiciable. The other cases the defendants cite are similarly distinguishable. *See El-Shifa Pharm*., 607 F.3d at 839-40; 844-45 (tort claims arising from the United States' bombing of a pharmaceutical plant in Sudan with alleged ties to Osama bin Laden presented a political question because the plaintiffs asked the court to "assess the merits of the President's decision to launch an attack on a foreign target"); *Schneider*, 412 F.3d at 196 (declining to adjudicate tort claims arising from the CIA's role in a military coup in Chile because the court would have to determine "whether, 35 years ago, at the height of the Cold War . . . it was proper for an

Executive Branch official to support covert actions against a committed Marxist who was set to take power in a Latin American county") (internal quotation marks omitted); *Harbury v. Hayden*, 522 F.3d 413, 421 (D.C. Cir. 2008) (common law tort claims arising from the CIA's alleged torture and killing of the plaintiff's husband in Guatemala in the early 1990's presented a political question); *Aktebe v. United States*, 105 F.3d 1400, 1404 (11th Cir. 1997) (wrongful death and personal injury claims brought by Turkish soldiers after the USS Saratoga launched missiles at a Turkish vessel during NATO training exercises presented a political question).

In contrast, the cases the plaintiffs cite demonstrate that tort claims challenging the Coast Guard's conduct pursuant to the MDLEA are justiciable. *See Tobar v. United States*, 731 F.3d 938, 940 (9th Cir. 2013) (assessing statutory defenses to tort claims brought by Ecuadorian fishermen arising from the Coast Guard's search and seizure of their vessel in international waters); *Coumou v. United States*, 107 F.3d 290, 291 (5th Cir. 1997), *opinion withdrawn and superseded in part on reh'g,* 114 F.3d 64 (5th Cir. 1997) (considering a negligence suit against the Coast Guard for personal injury and property damage after the Coast Guard boarded and searched the plaintiff's boat and transferred both the plaintiff and the boat to Haitian authorities). The government attempts to distinguish these cases by asserting that they did not involve treaties, diplomacy, or detention of foreign nationals at sea pursuant to an international agreement. Reply at 3. In doing so, the government overlooks important aspects of both cases. *Coumou* and *Tobar* both examined the United States' interactions with foreign sovereigns. *See Tobar v. United States*, 07-cv-817, 2016 WL 1367224, at *6 (S.D. Cal. Apr. 5, 2016), *aff'd,* 698 F. App'x 523 (9th Cir. 2017) (making factual findings about interactions between Ecuador and the Coast Guard while determining whether the Coast Guard damaged the vessel in question before transferring it to Ecuador); *Coumou*, 107 F.3d at 292 (remanding the case to the district

court to determine "whether federal agents were negligent in failing to notify Haitian officials that Coumou was a government informant who cooperated with drug enforcement officers in their search of his vessel"); *Coumou v. United States*, 93-cv-1465, 1997 WL 644091, at *9 (E.D. La. Oct. 17, 1997) (concluding on remand that the Coast Guard acted negligently by breaching its duty to inform Haitian officials of the plaintiff's cooperation with the Coast Guard). Morever, the Convention was in force and applicable when the events at issue in *Tobar* occurred, as a Coast Guard affidavit from that case demonstrates. *See* Kieserman Decl. 5 ¶ 13, Aug. 31, 2007, ECF No. 15, *Tobar v. United States*, 07-cv-817 (S.D. Cal. 2007) ("In accordance with Article 17 of the 1988 U.N. Convention against Illicit Traffic in Narcotic Drugs and Psychotropic Substances to which both the United States and Ecuador are parties, the United States initiated an inquiry to the Government of Ecuador" to seek confirmation "from the Government of Ecuador" that the vessel in question was Ecuadorian and to request permission from Ecuador "to conduct a law enforcement boarding" of the vessel). Just because this case may impact foreign policy or involve judicial scrutiny of the Coast Guard's interactions with the Jamaican government, including pursuant to its treaty obligations, does not render the entire Complaint nonjusticiable.

Still, the defendants contend that the Coast Guard's conduct is beyond judicial scrutiny because it was entirely governed by the Bilateral Agreement. That argument fails to persuade the Court for a number of reasons. First, it contradicts the terms of the Bilateral Agreement. *See Medellin v. Texas,* 552 U.S. 491, 506 (2008) ("The interpretation of a treaty . . . begins with its text."). Although the Bilateral Agreement includes provisions regarding the resolution of disputes between Jamaica and the United States, it also provides that the two countries shall resolve their disputes "without prejudice to any other legal rights which may be available to the parties or to any persons or entities affected by any such action . . . ." Bilateral Agreement, Art.

20. The Bilateral Agreement also emphasizes that "[n]othing in this Agreement is intended to prejudice the rights and privileges due any individual in any legal proceeding." *Id*. Art. 22. Article 22 demonstrates that the treaty itself does not preclude the plaintiffs from bringing this case, and contradicts the government's contention that the existence of the treaty forecloses the plaintiffs' claims.

Second, the defendants' argument minimizes the role the MDLEA played in the defendants' actions. The Coast Guard was enforcing the MDLEA when it detained the defendants. *See* 14 U.S.C. § 552(a) ("The Coast Guard may make inquiries, examinations, inspections, searches, seizures, and arrests upon the high seas and waters over which the United States has jurisdiction, for the prevention, detection, and suppression of violations of laws of the United States."). The MDLEA criminalizes drug manufacturing and distribution on, *inter alia*, "a vessel subject to the jurisdiction of the United States," which includes "a vessel registered in a foreign nation if that nation has consented or waived objection to the enforcement of United States law by the United States." 46 U.S.C. § 70503(e)(1); *id*. § 70502(c)(1)(C). The Coast Guard acted pursuant to the MDLEA and the Bilateral Agreement—not the Bilateral Agreement alone—when it sought Jamaica's consent to waive jurisdiction over the *Josette*.[3]

Finally, the defendants' argument has no limiting principle. Opp'n at 16. According to the defendants, where a similar bilateral treaty exists, a court must dismiss as a political question any suit where the Coast Guard detains foreign nationals aboard a foreign-registered vessel with

---

[3] Contrary to the government's suggestion that the MDLEA was passed "in anticipation of" the Convention, "Congress enacted what would later become the MDLEA" in 1980, and the MDLEA itself was enacted in 1986, two years before the Convention, and more than a decade before the Bilateral Agreement. *Carvajal*, 924 F. Supp. 2d at 231; *see also United States v. Mosquera-Murillo*, 902 F.3d 285, 290 (D.C. Cir. 2018) ("Congress enacted what is now known as the MDLEA" in 1980 (citing Pub. L. No. 96-350, § 1, 94 Stat. 1159) (1980)); *United States v. Davila-Mendoza*, 972 F.3d 1264, 1277 (11th Cir. 2020) ("the MDLEA was enacted long before the Convention against Illicit Traffic Treaty or the Jamaica Bilateral Agreement; therefore, it was not *enacted . . . to effectuate* those international agreements").

the consent of the foreign power, no matter how long the detention or how bad the treatment. This is an untenably broad theory of the political question doctrine, which is "a limited and narrow exception to federal court jurisdiction" that mandates dismissal only if a political question is "inextricable from the case." *Al Tamimi*, 916 F.3d at 8; 13.

In light of the foregoing, the Court is not convinced that the entire Complaint is nonjusticiable. However, the issue of whether the defendants should have brought the plaintiffs to the United States before Jamaica waived jurisdiction presents the Court with a political question. The Bilateral Agreement articulates the process for the United States to obtain jurisdiction over Jamaican nationals. Bilateral Agreement, Art. 3 ¶ 5 (providing that "[w]here a vessel of one Party is detained seaward of any State's territorial sea, that Party shall have the right to exercise jurisdiction over the . . . persons on board, but . . . may . . . waive its right to exercise jurisdiction and authorize the other Party to enforce its laws against the . . . persons on board."). It is not for the Court to second-guess whether the Executive should have complied with its treaty obligations, or its decisions about what actions related to Jamaican nationals would offend Jamaica or upset diplomatic relations.

This conclusion does not mean the Court will dismiss the entire Complaint, as the defendants advocate. *See Al-Tamimi*, 916 F.3d at 9 (if a political question is presented, courts must "decide whether the plaintiffs' claims can be resolved without considering any political question, to the extent one or more is presented."). Rather, the Court can adjudicate the claims that challenge the length of detention by asking whether the Coast Guard detained the plaintiffs in a lawful manner in light of the United States' obligation to wait until Jamaica waived jurisdiction under the Bilateral Agreement before bringing the defendants to the United States for

prosecution.[4] *See, e.g., United States v. Marin*, No. 19-cr-488-T-36JSS, 2020 WL 6537383, at *4

(M.D. Fla. Nov. 6, 2020) (finding that the magistrate judge properly factored "issues of

international communication, comity and jurisdiction" into its conclusion that there was no

unnecessary delay presenting the defendant for arraignment under Federal Rule of Criminal

Procedure 5(a)); Report & Rec. at 23, Apr. 24, 2020, ECF No. 151, *United States v. Marin*, No.

19-cr-488-T-36JSS (M.D. Fla.) (concluding that "the evidence establishes that the reason for the

delay in this case was entirely based on the Coast Guard's attempts to communicate with the

Republic of Cameroon and determine the proper location for prosecution.").

### 2.   Are There a Lack of Judicially Discoverable and Manageable Standards for Resolving the Issues?

The defendants argue that the Court lacks judicially manageable standards for resolving

this case because the Court will have to analyze communications with a foreign sovereign, and

the Coast Guard's decisions regarding detaining drug trafficking suspects on warships. Mot. to

Dismiss at 24. They also assert that there is no clear standard of care that can provide guidance

as to the length and conditions of detention at sea, and Executive agency decisions made while

conducting diplomatic negotiations with a foreign state. *Id*. at 27.

The plaintiffs contend that there are judicially manageable standards to address their

challenges to the destruction of their boat, the length of time they were held, and the conditions

of their detention. Opp'n at 26. They argue that courts consistently apply legal standards to

adjudicate the maritime torts alleged here, and that claims involving unlawful detention and

mistreatment are "so inherently judicially manageable" that courts have found them justiciable

---

[4] The parties dispute when Jamaica waived jurisdiction over the plaintiffs. Opp'n at 15. However, the State Department Certification provides that "[o]n October 9, 2017, the Government of Jamaica consented to the exercise of jurisdiction by the United States." Mot. to Dismiss, Ex. A at 3 [ECF No. 12-2].

even when the conduct occurs in foreign territories and outside the law enforcement context. *Id.* at 28.

There are well-established standards to adjudicate maritime torts. *See, e.g., Sawyer Bros. Inc. v. Island Transporter, LLC*, 887 F.3d 23, 29 (1st Cir. 2018) ("under maritime negligence law, 'a shipowner owes the duty of exercising reasonable care towards those lawfully aboard the vessel who are not members of the crew.'") (quoting *Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 630 (1959)). Even though the concerns regarding the treatment of detainees at sea are unique, courts are equipped to assess these conditions. *See, e.g., Borges v. United States*, 652 F. App'x 824, 826-27 (11th Cir. 2016) (affirming district court decision that Coast Guard medical personnel exercised reasonable care while treating the injuries of a Cuban detainee on a Coast Guard vessel); *Bethell v. United States*, No. 15-cv-62390, 2017 WL 1370941, at *8 (S.D. Fla. Apr. 17, 2017) (determining at trial that the Coast Guard was not negligent while rescuing an American citizen who sustained life-altering injuries); *cf Harrell v. United States*, 875 F.2d 828, 831 (11th Cir. 1989) (concluding that a Coast Guard Lieutenant did not act "unreasonably in conducting . . . strip-searches of the plaintiffs" and that "[w]ith respect to the reasonableness of plaintiffs' detention . . . overnight detention . . . was not clearly unlawful . . . "); *United States v. Purvis*, 768 F.2d 1237, 1239 (11th Cir. 1985) (concluding that the Coast Guard did not mistreat the defendants during five days of pre-arraignment detention while keeping the defendants "handcuffed in a semi-sheltered area on the deck of the Coast Guard vessel[,] . . . [t]he arrests took place during June and there [was] no indication that the weather was cold or otherwise inclement[, . . .] appellants were fed regularly, given mattresses on which to sleep, and had access to bathrooms"); *United States v. Torres-Iturre*, No. 15-cr-2586, 2016 WL 2757283, at *5 (S.D. Cal. May 12, 2016) (concluding that "the four-day period of length of

time between some showers, having to clean a toilet on one occasion with their gloved hands, exposures to the elements through a garage style door, spoiled rice and beans on one occasion, and exposure to soot from the engines cannot be considered so grossly shocking and so outrageous as to violate the universal sense of justice.") (internal quotation marks omitted).

The defendants have cited a number of maritime cases questioning military or national security decisions to argue that there are no judicially discoverable and manageable standards to adjudicate this case. *See* Mot. to Dismiss at 25-27. However, again, these cases underscore the difference between tort claims arising from military or foreign intelligence operations and those arising from law enforcement operations aimed at drug trafficking. For example, the defendants assert that this case is analogous to *Wu Tien Li-Shou v. United States*. 777 F.3d 175 (4th Cir. 2015). In *Wu*, the plaintiff sued for damages under the PVA and the SAA over the killing of her husband and destruction of his ship, which had been hijacked by pirates, during a NATO anti-piracy mission. *Wu Tien Li-Shou*, 777 F.3d at 178. The Navy opened fire on the ship, killing the plaintiff's husband in the process, then sunk the ship pursuant to NATO orders. *Id*. at 179. In determining that the case was non-justiciable, the court found that in order to find negligence:

> [The plaintiff] would have the court consider the precise details of the military engagement: what kind of warnings were given, the type of ordnance used, the sort of weapons deployed, the range of fire selected, and the pattern, timing, and escalation of the firing . . . . Discovery easily could draw the court and the parties into the technicalities of battle, with subpoenas issuing to NATO and American commanders on down to the Gunnery Direction Officer. As judges, we are just not equipped to second-guess such small-bore tactical decisions. We also are ill-suited to evaluate more strategic considerations. We do not know the waters. We do not know the respective capabilities of individual pirate ships or naval frigates. We do not know the functionality and limitations of the counter-piracy task force's assets . . . . That is not all. This case threatens to involve the courts in the command structures of both the U.S. military and Operation Ocean Shield.

*Id*. at 180-181. Unlike *Wu*, the Court here is being asked to examine the Executive's conduct during a law enforcement operation at sea; it is not being asked to second-guess the details of a

military engagement, evaluate tactical decisions, or involve itself in the command structure of the Coast Guard's operation. *See id.* at 182 (emphasizing that "nothing about the events . . . from their far away location, to the international forces and threat involved, to the military command structure and equipment deployed . . . [was] consistent with traditional police action," noting that "American military forces typically do not take part in simple law enforcement"). Indeed, the United States routinely brings criminal charges pursuant to the MDLEA over drugs trafficked at sea, as it did with the plaintiffs in this case.  [ECF No. 12-3 at 2]; *see, e.g., United States v. Mosquera-Murillo*, 902 F.3d 285, 287 (D.C. Cir. 2018) (appeal from prosecution of Columbia nationals under the MDLEA). The other cases cited by the defendants further demonstrate this distinction. *See Aktebe*, 105 F.3d at 1404 (no judicially manageable standards existed for the court to adjudicate negligence claims that would require the court to determine "how a reasonable military force would have conducted" a missile firing drill); *Tarros S.p.A. v. United States*, 982 F. Supp. 2d 325, 333 (S.D.N.Y. 2013) (tort action to recover damages caused by US Naval blockade of the port of Tripoli presented political question because the "decision as to whether to divert a vessel bound for a wartorn nation in order to enforce an international arms embargo" was "far from an 'ordinary tort suit'" and would require the court to "wade into the heart of military operations") (*quoting Klinghoffer v. S.N.C. Achille Lauro*, 937 F.2d 44, 50 (2d Cir. 1991)); *Chaser Shipping Corp. v. United States*, 649 F. Supp. 736, 738-39 (S.D.N.Y. 1986), *aff'd* 819 F.2d 1129 (2nd Cir. 1987) (tort suit over CIA placement of mines in Nicaraguan harbor presented political question)).

The defendants also argue that it is not for the Court to decide "how the nation-to-nation communications and decision-making should have happened in this case," citing provisions in the MDLEA providing that the State Department's Certification conclusively demonstrates the

response of the foreign state, and prohibiting criminal defendants from invoking a failure to comply with international law as a defense to a conviction under the MDLEA. Mot. to Dismiss at 23; 46 U.S.C. § 70502(c)(2)(B); 18 U.S.C. § 2237 (same)). However, the Court is not being asked to determine how the United States should have communicated with Jamaica. Just because this case might involve judicial review of the United States' correspondence with a foreign sovereign does not make it judicially unmanageable. *See, e.g., Tobar*, 2016 WL 1367224, at *5-6 (discussing correspondence between Coast Guard and Ecuadorian officials).

### 3.    Do Any Prudential Factors Apply?

The defendants argue that prudential factors "counsel against judicial pronouncements" on the United States' diplomacy with Jamaica. Mot. to Dismiss at 28. They assert that any judicial pronouncements on Jamaica's communications with the detainees' families would be "problematic to ongoing foreign relations." *Id*. at 29.

Counts Eight (Forced Disappearance) and Ten (Prolonged Arbitrary Detention) both ask whether the United States should have notified the plaintiffs' families that they were being detained. The defendants assert that they notified Jamaica of the plaintiffs' detention on September 14, when they requested permission to board the *Josette*, and again on September 18 when they requested that Jamaica waive jurisdiction, as reflected in the State Department Certification. *Id*. at 24; Ex. A. They argue that discovery into why the plaintiffs' families were not notified directly would involve questions about Jamaica's practices, and upset foreign relations. *Id*. In their opposition, the plaintiffs construe the relevant question as whether the United States' communications to the Jamaican government that the plaintiffs were detained was "sufficient to avoid liability for the tort of forced disappearance." Opp'n at 26 n.5.

The Court agrees that this line of inquiry would improperly involve the Court in questioning the Executive's diplomatic decision-making. The Court cannot adjudicate these

counts without asking how Jamaica responded to the news that its nationals were being detained, and determining whether the Coast Guard made the appropriate decisions in light of Jamaica's response. This would not only raise prudential concerns, but also implicates the first *Baker* factor by asking the Court to second-guess the Executive's foreign policy choices. Accordingly, the Court will dismiss Counts Eight and Ten. Given the Court's other conclusions about the claims raised by the Complaint, prudential concerns do not bar the Court's adjudication of the rest of the plaintiffs' claims.

## IV.     Conclusion

For the foregoing reasons, the defendants' motion to dismiss the Complaint will be granted in part and denied in part.[5] An appropriate order accompanies this opinion.

January 15, 2021

Thomas F. Hogan
SENIOR UNITED STATES DISTRICT JUDGE

---

[5] The defendants have mentioned other grounds for dismissal without briefing them. Mot. to Dismiss at 30-32. Accordingly, they are not currently pending before the Court.